PENSION BENEFIT GUARANTY CORPORATION
*v.* THE LTV CORP. ET AL.

No. 89–390.   Argued February 27, 1990—Decided June 18, 1990

634

635

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, MARSHALL, SCALIA, and KENNEDY, JJ., joined, and in which WHITE and O'CONNOR, JJ., joined except as to the statement of judgment and n. 11. WHITE, J., filed an opinion concurring in part and dissenting in part, in which O'CONNOR, J., joined, *post*, p. 656. STEVENS, J., filed a dissenting opinion, *post*, p. 657.

*Carol Connor Flowe* argued the cause for petitioner. With her on the briefs were *James J. Armbruster, Raymond Morgan Forster, Thomas S. Martin, Richard K. Willard,* and *Charles G. Cole.*

*Lewis B. Kaden* argued the cause for respondents. With him on the brief for respondents The LTV Corporation et al. were *Karen E. Wagner, Michael J. Crames, Marc Abrams,* and *Frank Cummings. Robin E. Phelan* and *Kathryn C. Mallory* filed a brief for respondent Banctexas Dallas, N. A. *Joel B. Zweibel, Geoffrey M. Kalmus, Michael J. Dell,* and *Peter V. Pantaleo* filed a brief for respondent LTV Bank

Group. *R. A. King* and *Kenneth R. Bruce* filed a brief for respondents David H. Miller et al. *Edgar H. Booth, Richard H. Kuh,* and *Mary S. Zitwer* filed a brief for respondent Official Committee of Equity Security Holders. *Leonard M. Rosen, Lawrence P. King, Theodore Gewertz, Harold S. Novikoff, Brian M. Cogan,* and *Mark A. Speiser* filed a brief for respondent Official Committee of Unsecured Creditors of LTV Steel Company, Inc. *William H. Roberts, Raymond L. Shapiro, Thomas E. Biron, William E. Taylor III,* and *Ann B. Laupheimer* filed a brief for respondent Official Parent Creditors' Committee of The LTV Corporation.*

JUSTICE BLACKMUN delivered the opinion of the Court.

In this case we must determine whether the decision of the Pension Benefit Guaranty Corporation (PBGC) to restore certain pension plans under § 4047 of the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 1028, as amended, 100 Stat. 237, 29 U. S. C. § 1347, was, as the Court of Appeals concluded, arbitrary and capricious or contrary to law, within the meaning of the Administrative Procedure Act (APA), 5 U. S. C. § 706.

I

Petitioner PBGC is a wholly owned United States Government corporation, see 29 U. S. C. § 1302, modeled after the

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Starr, Deputy Solicitor General Shapiro,* and *Christopher J. Wright;* for the American Society of Pension Actuaries by *Chester J. Salkind;* for Armco et al. by *Benjamin R. Civiletti* and *W. Warren Hamel;* and for the Retired Employees Benefits Coalition, Inc., by *Bruce E. Davis.*

Briefs of *amici curiae* urging affirmance were filed for the State of Ohio by *Anthony J. Celebrezze, Jr.,* Attorney General, and *Loren L. Braverman;* and for the American Federation of Labor and Congress of Industrial Organizations et al. by *Robert M. Weinberg, Jeremiah A. Collins, Peter O. Shinevar, Laurence Gold, Bernard Kleiman, Carl B. Frankel, Paul Whitehead,* and *Karin S. Feldman.*

*William J. Kilberg* and *Baruch A. Fellner* filed a brief for Wheeling-Pittsburgh Steel Corp. as *amicus curiae.*

Federal Deposit Insurance Corporation. See 120 Cong. Rec. 29950 (1974) (statement of Sen. Bentsen). The Board of Directors of the PBGC consists of the Secretaries of the Treasury, Labor, and Commerce. 29 U. S. C. § 1302(d). The PBGC administers and enforces Title IV of ERISA. Title IV includes a mandatory Government insurance program that protects the pension benefits of over 30 million private-sector American workers who participate in plans covered by the Title.[1] In enacting Title IV, Congress sought to ensure that employees and their beneficiaries would not be completely "deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.*, 467 U. S. 717, 720 (1984). See also *Nachman Corp.* v. *Pension Benefit Guaranty Corporation*, 446 U. S. 359, 361–362, 374–375 (1980).

When a plan covered under Title IV terminates with insufficient assets to satisfy its pension obligations to the employees, the PBGC becomes trustee of the plan, taking over the plan's assets and liabilities. The PBGC then uses the plan's assets to cover what it can of the benefit obligations. See 29 U. S. C. § 1344 (1982 ed. and Supp. IV). The PBGC then must add its own funds to ensure payment of most of the remaining "nonforfeitable" benefits, *i. e.*, those benefits to

---

[1] Title IV covers virtually all "defined benefit" pension plans sponsored by private employers. A defined benefit plan is one that promises to pay employees, upon retirement, a fixed benefit under a formula that takes into account factors such as final salary and years of service with the employer. See 29 U. S. C. § 1321. It is distinguished from a "defined contribution" plan (also known as an "individual account" plan), under which the employer typically contributes a percentage of an employee's compensation to an account, and the employee is entitled to the account upon retirement. See 29 U. S. C. §§ 1002(34) and (35). ERISA insurance does not cover defined contribution plans because employees are not promised any particular level of benefits; instead, they are promised only that they will receive the balances in their individual accounts.

which participants have earned entitlement under the plan terms as of the date of termination. §§ 1301(a)(8), 1322(a) and (b). ERISA does place limits on the benefits PBGC may guarantee upon plan termination, however, even if an employee is entitled to greater benefits under the terms of the plan. See 29 CFR § 2621.3(a)(2) and App. A (1989); 29 U. S. C. § 1322(b)(3)(B). In addition, benefit increases resulting from plan amendments adopted within five years of the termination are not paid in full. Finally, active plan participants (current employees) cease to earn additional benefits under the plan upon its termination and lose entitlement to most benefits not yet fully earned as of the date of plan termination. 29 U. S. C. §§ 1322(a) and (b), 1301(a)(8); 29 CFR § 2613.6 (1989).

The cost of the PBGC insurance is borne primarily by employers that maintain ongoing pension plans. Sections 4006 and 4007 of ERISA require these employers to pay annual premiums. See 29 U. S. C. §§ 1306 and 1307 (1982 ed. and Supp. IV). The insurance program is also financed by statutory liability imposed on employers who terminate underfunded pension plans. Upon termination, the employer becomes liable to the PBGC for the benefits that the PBGC will pay out.[2] Because the PBGC historically has recovered only a small portion of that liability, Congress repeatedly has been forced to increase the annual premiums. Even with these increases, the PBGC in its most recent annual report noted liabilities of $4 billion and assets of only $2.4 billion, leaving a deficit of over $1.5 billion.

As noted above, plan termination is the insurable event under Title IV. Plans may be terminated "voluntarily" by an employer or "involuntarily" by the PBGC. An employer may terminate a plan voluntarily in one of two ways. It may proceed with a "standard termination" only if it has sufficient

---

[2] Prior to 1987, employers were liable for only 75% of PBGC's expenditures. In that year, Congress eliminated the 75% cap. See Pension Protection Act, Pub. L. 100–203, 101 Stat. 1330–333.

assets to pay all benefit commitments. A standard termination thus does not implicate PBGC insurance responsibilities. If an employer wishes to terminate a plan whose assets are insufficient to pay all benefits, the employer must demonstrate that it is in financial "distress" as defined in 29 U. S. C. § 1341(c) (1982 ed., Supp. IV). Neither a standard nor a distress termination by the employer, however, is permitted if termination would violate the terms of an existing collective-bargaining agreement. 29 U. S. C. § 1341(a)(3).

The PBGC, though, may terminate a plan "involuntarily," notwithstanding the existence of a collective-bargaining agreement. *Ibid.* Section 4042 of ERISA provides that the PBGC may terminate a plan whenever it determines that:

> "(1) the plan has not met the minimum funding standard required under section 412 of title 26, or has been notified by the Secretary of the Treasury that a notice of deficiency under section 6212 of title 26 has been mailed with respect to the tax imposed under section 4791(a) of title 26,
>
> "(2) the plan will be unable to pay benefits when due,
>
> "(3) the reportable event described in section 1343(b)(7) of this title has occurred, or
>
> "(4) the possible long-run loss of the [PBGC] with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated." 29 U. S. C. § 1342(a).

Termination can be undone by PBGC. Section 4047 of ERISA, 29 U. S. C. § 1347, provides:

> "In the case of a plan which has been terminated under section 1341 or 1342 of this title the [PBGC] is authorized in any such case in which [it] determines such action to be appropriate and consistent with its duties under this subchapter, to take such action as may be necessary to restore the plan to its pretermination status, including, but not limited to, the transfer to the employer or a plan

administrator of control of part or all of the remaining assets and liabilities of the plan."

When a plan is restored, full benefits are reinstated, and the employer, rather than the PBGC, again is responsible for the plan's unfunded liabilities.

## II

This case arose after respondent The LTV Corporation (LTV Corp.) and many of its subsidiaries, including LTV Steel Company Inc. (LTV Steel), (collectively LTV), in July 1986 filed petitions for reorganization under Chapter 11 of the Bankruptcy Code. At that time, LTV Steel was the sponsor of three defined benefit pension plans (Plans) covered by Title IV of ERISA. Two of the Plans were the products of collective-bargaining negotiations with the United Steelworkers of America (Steelworkers). The third was for nonunion salaried employees. Chronically underfunded, the Plans, by late 1986, had unfunded liabilities for promised benefits of almost $2.3 billion. Approximately $2.1 billion of this amount was covered by PBGC insurance.

It is undisputed that one of LTV Corp.'s principal goals in filing the Chapter 11 petitions was the restructuring of LTV Steel's pension obligations, a goal which could be accomplished if the Plans were terminated and responsibility for the unfunded liabilities was placed on the PBGC. LTV Steel then could negotiate with its employees for new pension arrangements. LTV, however, could not voluntarily terminate the Plans because two of them had been negotiated in collective bargaining. LTV therefore sought to have the PBGC terminate the Plans.

To that end, LTV advised the PBGC in 1986 that it could not continue to provide complete funding for the Plans. PBGC estimated that, without continued funding, the Plans' $2.1 billion underfunding could increase by as much as $65 million by December 1987 and by another $63 million by December 1988, unless the Plans were terminated. Moreover, extensive plant shutdowns were anticipated. These shut-

downs, if they occurred before the Plans were terminated, would have required the payment of significant "shutdown benefits." The PBGC estimated that such benefits could increase the Plans' liabilities by as much as $300 million to $700 million, of which up to $500 million would be covered by PBGC insurance. Confronted with this information, the PBGC, invoking § 4042(a)(4) of ERISA, 29 U. S. C. § 1342(a)(4), determined that the Plans should be terminated in order to protect the insurance program from the unreasonable risk of large losses, and commenced termination proceedings in the District Court. With LTV's consent, the Plans were terminated effective January 13, 1987.[3]

Because the Plans' participants lost some benefits as a result of the termination, the Steelworkers filed an adversary action against LTV in the Bankruptcy Court, challenging the termination and seeking an order directing LTV to make up the lost benefits. This action was settled, with LTV and the Steelworkers negotiating an interim collective-bargaining agreement that included new pension arrangements intended to make up benefits that plan participants lost as a result of the termination. New payments to retirees were based explicitly upon "a percentage of the difference between the benefit that was being paid under the Prior Plans and the amount paid by the PBGC." App. 181. Retired participants were thereby placed in substantially the same positions they would have occupied had the old Plans never been terminated. The new agreements respecting active participants were also designed to replace benefits under the old Plans that were not insured by the PBGC, such as early retirement benefits and shutdown benefits. With respect to shutdown benefits, LTV stated in Bankruptcy Court that the new benefits totaled "75% of benefits lost as a result of plan termination."

---

[3] The Steelworkers appealed the District Court's judgment (giving effect to the PBGC's termination) to the United States Court of Appeals for the Second Circuit. That court affirmed. *Jones & Laughlin Hourly Pension Plan* v. *LTV Corp.*, 824 F. 2d 197 (1987).

*Id.*, at 159. With respect to some other kinds of benefits for active participants, the new arrangements provided 100% or more of the lost benefits. *Id.*, at 235.

The PBGC objected to these new pension agreements, characterizing them as "follow-on" plans. It defines a follow-on plan as a new benefit arrangement designed to wrap around the insurance benefits provided by the PBGC in such a way as to provide both retirees and active participants substantially the same benefits as they would have received had no termination occurred. The PBGC's policy against follow-on plans stems from the agency's belief that such plans are "abusive" of the insurance program and result in the PBGC's subsidizing an employer's ongoing pension program in a way not contemplated by Title IV. The PBGC consistently has made clear its policy of using its restoration powers under § 4047 if an employer institutes an abusive follow-on plan. In three opinion letters, two in 1981 and one in 1986, the PBGC stated: "[T]he termination insurance program of Title IV was not intended to subsidize an employer's ongoing retirement program." App. to Pet. for Cert. 162a, 167a, 173a. Accordingly, the PBGC has indicated that if an employer adopts a new plan that, "together with the guaranteed benefits paid by the PBGC under the terminated plan, provide[s] for the payment of, accrual of, or eligibility for benefits that are substantially the same as those provided under the terminated plan," App. 229, the PBGC will view the plan as an attempt to shift liability to the termination insurance program while continuing to operate the plan.

LTV ignored the PBGC's objections to the new pension arrangements and asked the Bankruptcy Court for permission to fund the follow-on plans. The Bankruptcy Court granted LTV's request. In doing so, however, it noted that the PBGC "may have legal options or avenues that it can assert administratively . . . to implement its policy goals. Nothing done here tonight precludes the PBGC from pursuing these options. . . ." *Id.*, at 261.

In early August 1987, the PBGC determined that the financial factors on which it had relied in terminating the Plans had changed significantly. Of particular significance to the PBGC was its belief that the steel industry, including LTV Steel, was experiencing a dramatic turnaround. As a result, the PBGC concluded it no longer faced the imminent risk, central to its original termination decision, of large unfunded liabilities stemming from plant shutdowns. Later that month, the PBGC's internal working group made a recommendation, based upon LTV's improved financial circumstances and its follow-on plans, to the PBGC's Executive Director to restore the Plans under the PBGC's § 4047 powers. After consulting the PBGC's Board of Directors, which agreed with the working group that restoration was appropriate, the Executive Director decided to restore the Plans.[4]

The Director issued a notice of restoration on September 22, 1987, indicating the PBGC's intent to restore the terminated Plans. The PBGC notice explained that the restoration decision was based on (1) LTV's establishment of "a retirement program that results in an abuse of the pension plan termination insurance system established by Title IV of ERISA," and (2) LTV's "improved financial circumstances." See App. to Pet. for Cert. 182a.[5] Restoration meant that

___

[4] Thereafter, the Executive Director offered to meet with LTV to "consider any additional information [it] might wish to supply." App. 348. Representatives of LTV and the PBGC then met on September 19 and 21, 1987. At these meetings, LTV officials expressed concern about the timing of the restoration decision and indicated that restoration would give rise to time-consuming litigation, which would cast doubt on the bankruptcy reorganization, thereby imposing hardship on other creditors.

[5] The PBGC also gave a third reason for restoration—LTV's "demonstrated willingness to fund employee retirement arrangements." See App. to Pet. for Cert. 182a. Before the Court of Appeals for the Second Circuit, the PBGC conceded that this reason was not an independent basis for the restoration decision but rather was "subsumed [with]in the other two" grounds. See 875 F. 2d 1008, 1020 (1989). Accordingly, the Court of Appeals did not address this explanation for restoration, and neither do we.

the Plans were ongoing, and that LTV again would be responsible for administering and funding them.

LTV refused to comply with the restoration decision. This prompted the PBGC to initiate an enforcement action in the District Court.[6] The court vacated the PBGC's restoration decision, finding, among other things, that the PBGC had exceeded its authority under § 4047. See *In re Chateaugay Corp.*, 87 B. R. 779 (SDNY 1988).

The Court of Appeals for the Second Circuit affirmed, holding that the PBGC's restoration decision was "arbitrary and capricious" or contrary to law under the APA, 5 U. S. C. § 706(2)(A), in various ways. 875 F. 2d 1008, 1015–1021 (1989). The court first concluded that the PBGC's action was arbitrary and capricious because the PBGC focused "inordinately on ERISA" to the exclusion of other laws. *Id.*, at 1016. The court then found the agency's anti-follow-on policy to be contrary to law because the "legislative history of section 4047 reveals no indication that Congress intended the establishment of successive [*i. e.*, follow-on] benefit plans to be a ground for restoration." *Id.*, at 1017. The court also found the PBGC's other basis for restoration—improved financial condition—inadequate because the PBGC did not explain many of its economic assumptions. *Id.*, at 1018–1020. Finally, the court concluded that the agency's restoration decision was arbitrary and capricious because the PBGC's decisionmaking process of informal adjudication lacked adequate procedural safeguards. *Id.*, at 1021.

Because of the significant administrative law questions raised by this case, and the importance of the PBGC's insurance program, we granted certiorari. 493 U. S. 932 (1989).

---

[6] Meanwhile, LTV filed an action in the Bankruptcy Court alleging that restoration would violate the automatic stay provision of the Bankruptcy Code. See 11 U. S. C. § 362(a). The District Court granted the PBGC's motion to withdraw LTV's action from the Bankruptcy Court pursuant to 28 U. S. C. § 157(d), and considered the two actions together. See *In re Chateaugay Corp.*, 86 B. R. 33 (SDNY 1987).

## III

### A

The Court of Appeals first held that the restoration decision was arbitrary and capricious under § 706(2)(A) because the PBGC did not take account of all the areas of law the court deemed relevant to the restoration decision. The court expressed the view that "[b]ecause ERISA, bankruptcy and labor law are involved in the case at hand, there must be a showing on the administrative record that PBGC, before reaching its decision, considered all of these areas of the law, and to the extent possible, honored the policies underlying them." 875 F. 2d, at 1015. The court concluded that the administrative record did not reflect thorough and explicit consideration by the PBGC of the "policies and goals" of each of the three bodies of law. *Id.*, at 1016. As the court put it, the PBGC "focused inordinately on ERISA." *Ibid.* The Court of Appeals did not hold that the PBGC's decision *actually conflicted* with any provision in the bankruptcy or labor laws, or that the PBGC's action "trench[ed] upon the . . . jurisdiction" of another agency. See *Burlington Truck Lines, Inc.* v. *United States*, 371 U. S. 156, 173 (1962). Rather, the court held that because labor law and bankruptcy law are "involved in the case at hand," the PBGC had an affirmative obligation, which had not been met, to address them. 875 F. 2d, at 1015.

The PBGC contends that the Court of Appeals misapplied the general rule that an agency must take into consideration all relevant factors, see *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 416 (1971), by requiring the agency explicitly to consider and discuss labor and bankruptcy law. We agree.

First, and most important, we do not think that the requirement imposed by the Court of Appeals upon the PBGC can be reconciled with the plain language of § 4047, under which the PBGC is operating in this case. This section gives the PBGC the power to restore terminated plans in any case

in which the PBGC determines such action to be "appropriate and consistent with its duties *under this title* [*i. e.*, Title IV of ERISA]" (emphasis added). The statute does not direct the PBGC to make restoration decisions that further the "public interest" generally, but rather empowers the agency to restore when restoration would further the interests that Title IV of ERISA is designed to protect. Given this specific and unambiguous statutory mandate, we do not think that the PBGC did or could focus "inordinately" on ERISA in making its restoration decision.

Even if Congress' directive to the PBGC had not been so clear, we are not entirely sure that the Court of Appeals' holding makes good sense as a general principle of administrative law. The PBGC points out problems that would arise if federal courts routinely were to require each agency to take explicit account of public policies that derive from federal statutes other than the agency's enabling Act. To begin with, there are numerous federal statutes that could be said to embody countless policies. If agency action may be disturbed whenever a reviewing court is able to point to an arguably relevant statutory policy that was not explicitly considered, then a very large number of agency decisions might be open to judicial invalidation.

The Court of Appeals' directive that the PBGC give effect to the "policies and goals" of other statutes, apart from what those statutes actually provide,[7] is questionable for another reason as well. Because the PBGC can claim no expertise in the labor and bankruptcy areas, it may be ill equipped to undertake the difficult task of discerning and applying the "policies and goals" of those fields. This Court recently observed:

"[N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the

---

[7] It is worth noting that the provisions of ERISA itself do take account of other areas of federal law. For example, as noted above, an employer may not voluntarily terminate a plan if to do so would violate the terms of a collective-bargaining agreement. 29 U. S. C. § 1341(a)(3).

very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez* v. *United States*, 480 U. S. 522, 525–526 (1987).

For these reasons, we believe the Court of Appeals erred in holding that the PBGC's restoration decision was arbitrary and capricious because the agency failed adequately to consider principles and policies of bankruptcy law and labor law.

B

The Court of Appeals also rejected the grounds for restoration that the PBGC *did* assert and discuss. The court found that the first ground the PBGC proffered to support the restoration—its policy against follow-on plans—was contrary to law because there was no indication in the text of the restoration provision, § 4047, or its legislative history that Congress intended the PBGC to use successive benefit plans as a basis for restoration. The PBGC argues that in reaching this conclusion the Court of Appeals departed from traditional principles of statutory interpretation and judicial review of agency construction of statutes. Again, we must agree.

In *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), we set forth the general principles to be applied when federal courts review an agency's interpretation of the statute it implements:

"When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an

administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*, at 842–843 (footnotes omitted).

Here, the PBGC has interpreted § 4047 as giving it the power to base restoration decisions on the existence of follow-on plans. Our task, then, is to determine whether any clear congressional desire to avoid restoration decisions based on successive pension plans exists, and, if the answer is in the negative, whether the PBGC's policy is based upon a permissible construction of the statute. See *Mead Corp.* v. *Tilley*, 490 U. S. 714 (1989) (applying *Chevron* principles to the PBGC's construction of ERISA).

Turning to the first half of the inquiry, we observe that the text of § 4047 does not evince a clear congressional intent to deprive the PBGC of the ability to base restoration decisions on the existence of follow-on plans. To the contrary, the textual grant of authority to the PBGC embodied in this section is broad. As noted above, the section authorizes the PBGC to restore terminated plans "in any such case in which [the PBGC] determines such action to be appropriate and consistent with its duties under [Title IV of ERISA]." 29 U. S. C. § 1347. The PBGC's duties consist primarily of furthering the statutory purposes of Title IV identified by Congress. These are:

"(1) to encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants,

"(2) to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries under plans to which this subchapter applies, and

"(3) to maintain premiums established by [the PBGC] under section 1306 of this title at the lowest level consistent with carrying out the obligations under this subchapter." 29 U. S. C. § 1302(a).

On their face, of course, none of these statutorily identified purposes has anything to say about the precise question at issue—the use of follow-on plans as a basis for restoration decisions.

Nor do any of the other traditional tools of statutory construction compel the conclusion that Congress intended that the PBGC not base its restoration decisions on follow-on plans. The Court of Appeals relied extensively on passages in the legislative history of the 1974 enactment of ERISA which suggest that Congress considered financial recovery a valid basis for restoration, but which make no mention of follow-on plans. The court reasoned that because follow-ons were not among the bases for restoration discussed by Members of Congress, that body must have intended that the existence of follow-ons *not* be a reason for restoring pension plans. See 875 F. 2d, at 1017.

We do not agree with this conclusion. We first note that the discussion in the legislative history concerning grounds for restoration was not limited to the financial-recovery example. The House Conference Report indicated that restoration was appropriate if financial recovery or "some other factor made termination no longer advisable." H. R. Conf. Rep. No. 93–1280, p. 378 (1974). Moreover, and more generally, the language of a statute—particularly language expressly granting an agency broad authority—is not to be regarded as modified by examples set forth in the legislative history. An example, after all, is just that: an illustration of a statute's operation in practice. It is not, as the Court of Appeals apparently thought, a definitive interpretation of a statute's scope. We see no suggestion in the legislative history that Congress intended its list of examples to be exhaustive. Under these circumstances, we conclude that ERISA's legislative history does not suggest "clear congressional intent" on the question of follow-on plans.

The Court of Appeals also relied on the legislative history of the 1987 amendments to ERISA effected by the Pension

Protection Act, Pub. L. 100–203, 101 Stat. 1330–333. See 875 F. 2d, at 1017. This history reveals that Congress in 1987 considered, but did not enact, a provision that expressly would have authorized the PBGC to prohibit follow-on plans. But subsequent legislative history is a "hazardous basis for inferring the intent of an earlier" Congress. *United States* v. *Price*, 361 U. S. 304, 313 (1960). It is a particularly dangerous ground on which to rest an interpretation of a prior statute when it concerns, as it does here, a proposal that does not become law. See, *e. g., United States* v. *Wise*, 370 U. S. 405, 411 (1962). Congressional inaction lacks "persuasive significance" because "several equally tenable inferences" may be drawn from such inaction, "including the inference that the existing legislation already incorporated the offered change." *Ibid.* These admonitions are especially apt in the instant case because Congress was aware of the action taken by the PBGC with respect to LTV at the time it rejected the proposed amendment. See H. R. Rep. No. 100–391, pt. 1, pp. 106–107 (1987). Despite Congress' awareness of the PBGC's belief that the adoption of follow-on plans was a ground for restoration, Congress did not amend § 4047 to restrict the PBGC's discretion. The conclusion that Congress thought the PBGC was properly exercising its authority is at least as plausible as any other. Thus, the legislative history surrounding the 1987 amendments provides no more support than the 1974 legislative history for the Court of Appeals' holding that the PBGC's interpretation of § 4047 contravened clear congressional will.

Having determined that the PBGC's construction is not contrary to clear congressional intent, we still must ascertain whether the agency's policy is based upon a "permissible" construction of the statute, that is, a construction that is "rational and consistent with the statute." *NLRB* v. *Food & Commercial Workers*, 484 U. S. 112, 123 (1987); see also *Sullivan* v. *Everhart*, 494 U. S. 83 (1990). Respondents argue that the PBGC's anti-follow-on policy is irrational be-

cause, as a practical matter, no purpose is served when the PBGC bases a restoration decision on something other than the improved financial health of the employer. According to respondents, "financial improvement [is] both a necessary and a sufficient condition for restoration. The agency's asserted abuse policy . . . is *logically irrelevant* to the restoration decision." Brief for Respondents LTV Corp. and LTV Steel 33 (emphasis added). We think not. The PBGC's anti-follow-on policy is premised on the belief, which we find eminently reasonable, that employees will object more strenuously to a company's original decision to terminate a plan (or to take financial steps that make termination likely) if the company cannot use a follow-on plan to put the employees in the same (or a similar) position after termination as they were in before. The availability of a follow-on plan thus would remove a significant check—employee resistance—against termination of a pension plan.

Consequently, follow-on plans may tend to frustrate one of the objectives of ERISA that the PBGC is supposed to accomplish—the "continuation and maintenance of voluntary private pension plans." 29 U. S. C. § 1302(a)(1). In addition, follow-on plans have a tendency to increase the PBGC's deficit and increase the insurance premiums all employers must pay, thereby frustrating another related statutory objective—the maintenance of low premiums. See 29 U. S. C. § 1302(a)(3). In short, the PBGC's construction based upon its conclusion that the existence of follow-on plans will lead to more plan terminations and increased PBGC liabilities is "assuredly a permissible one." *Everhart*, 494 U. S., at 93. Indeed, the judgments about the way the real world works that have gone into the PBGC's anti-follow-on policy are precisely the kind that agencies are better equipped to make than are courts.[*] This practical agency expertise is one of the princi-

---

[*] JUSTICE STEVENS suggests that the possibility of follow-on plans will make employees "no less likely to object to the financial steps that will lead to [an involuntary] plan termination because they would have no basis for

pal justifications behind *Chevron* deference. See 467 U. S., at 865.

None of this is to say that financial improvement will never be relevant to a restoration decision. Indeed, if an employer's financial situation remains so dire that restoration would lead inevitably to immediate retermination, the PBGC may decide not to restore a terminated plan even where the employer has instituted a follow-on plan.[9] For present purposes, however, it is enough for us to decide that where, as here, there is no suggestion that immediate retermination of the plans will be necessary,[10] it is rational for the PBGC to disfavor follow-on plans.[11]

belief that a union will insist on [the adoption of follow-on plans] when, perhaps years later, the PBGC involuntarily terminates the plan." *Post*, at 659 (dissenting opinion). There is no reason to believe, however, that financial decisions that lead to an involuntary termination always or ordinarily occur far in advance of the termination itself. Thus, as JUSTICE STEVENS himself acknowledges with respect to a voluntary termination, "those who could object to [the events resulting in an involuntary termination may also be] reasonably assured of receiving benefits when the insurance is paid." *Ibid.* Moreover, even when an involuntary termination does not occur until well after the financial decisions that lead to termination are made, we think the PBGC's apparent belief that employee resistance to those financial decisions will be lessened to some degree by the prospect of follow-on plans after termination is not an unreasonable one.

[9] For example, the PBGC did not restore a fourth LTV plan that had been terminated because, among other things, the plan had insufficient assets to pay benefits when due. App. 318.

[10] In this respect we observe that in its notice of restoration, the PBGC relied on the *long-term* potential for PBGC liability. See 29 U. S. C. § 1342(a)(4). The PBGC did not conclude that the Plans were in any imminent danger or that LTV could not meet the statutory minimum-funding requirements. In fact, the PBGC observed in the notice that LTV did have "sufficient cash" to cover current benefits. See App. to Pet. for Cert. 183a. No party has suggested to this Court that, at the time of restoration, immediate retermination, either voluntary or involuntary, was likely.

[11] Because we, like the Court of Appeals, read the PBGC's notice of restoration as indicating that the PBGC's anti-follow-on policy constitutes an independent ground for the restoration decision, we need not address that

## C

Finally, we consider the Court of Appeals' ruling that the agency procedures were inadequate in this particular case. Relying upon a passage in *Bowman Transportation, Inc.* v. *Arkansas-Best Freight System, Inc.*, 419 U. S. 281, 288, n. 4 (1974), the court held that the PBGC's decision was arbitrary and capricious because the "PBGC neither apprised LTV of the material on which it was to base its decision, gave LTV an adequate opportunity to offer contrary evidence, proceeded in accordance with ascertainable standards . . . , nor provided [LTV] a statement showing its reasoning in applying those standards." 875 F. 2d, at 1021. The court suggested that on remand the agency was required to do each of these things.

The PBGC argues that this holding conflicts with *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.*, 435 U. S. 519 (1978), where, the PBGC contends, this Court made clear that when the Due Process Clause is not implicated and an agency's governing statute contains no specific procedural mandates, the APA establishes the maximum procedural requirements a reviewing court may impose on agencies. Although *Vermont Yankee* concerned additional procedures imposed by the Court of Appeals for the District of Columbia Circuit on the Atomic Energy Commission when the agency was engaging in informal rulemaking, the PBGC argues that the informal adjudication process by which the restoration decision was made should be governed by the same principles.

Respondents counter by arguing that courts, under some circumstances, do require agencies to undertake additional procedures. As support for this proposition, they rely on *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402 (1971). In *Overton Park*, the Court concluded that the

---

court's ruling that the PBGC's methodology with regard to the other asserted basis for restoration—improved financial condition—was flawed.

Secretary of Transportation's *"post hoc* rationalizations" regarding a decision to authorize the construction of a highway did not provide "an [a]dequate basis for [judicial] review" for purposes of the APA, 5 U. S. C. § 706. *Id.*, at 419. Accordingly, the Court directed the District Court on remand to consider evidence that shed light on the Secretary's reasoning at the time he made the decision. Of particular relevance for present purposes, the Court in *Overton Park* intimated that one recourse for the District Court might be a remand to the agency for a fuller explanation of the agency's reasoning at the time of the agency action. See *id.*, at 420–421. Subsequent cases have made clear that remanding to the agency in fact is the preferred course. See *Florida Power & Light Co.* v. *Lorion*, 470 U. S. 729, 744 (1985) ("[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"). Respondents contend that the instant case is controlled by *Overton Park* rather than *Vermont Yankee*, and that the Court of Appeals' ruling was thus correct.

We believe that respondents' argument is wide of the mark. We begin by noting that although one initially might feel that there is some tension between *Vermont Yankee* and *Overton Park*, the two cases are not necessarily inconsistent. *Vermont Yankee* stands for the general proposition that courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA. See 435 U. S., at 524. At most, *Overton Park* suggests that § 706 (2)(A), which directs a court to ensure that an agency action is not arbitrary and capricious or otherwise contrary to law, imposes a general "procedural" requirement of sorts by mandating that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision.

Here, unlike in *Overton Park*, the Court of Appeals did not suggest that the administrative record was inadequate to enable the court to fulfill its duties under § 706. Rather, to support its ruling, the court focused on "fundamental fairness" to LTV. 875 F. 2d, at 1020–1021. With the possible exception of the absence of "ascertainable standards"—by which we are not exactly sure what the Court of Appeals meant—the procedural inadequacies cited by the court all relate to LTV's role in the PBGC's decisionmaking process. But the court did not point to any provision in ERISA or the APA which gives LTV the procedural rights the court identified. Thus, the court's holding runs afoul of *Vermont Yankee* and finds no support in *Overton Park*.

Nor is *Arkansas-Best*, the case on which the Court of Appeals relied, to the contrary. The statement relied upon (which was dictum) said: "A party is entitled, of course, to know the issues on which decision will turn and to be apprised of the factual material on which the agency relies for decision so that he may rebut it." 419 U. S., at 288, n. 4. That statement was entirely correct in the context of *Arkansas-Best*, which involved a formal adjudication by the Interstate Commerce Commission pursuant to the trial-type procedures set forth in §§ 5, 7 and 8 of the APA, 5 U. S. C. §§ 554, 556–557, which include requirements that parties be given notice of "the matters of fact and law asserted," § 554(b)(3), an opportunity for "the submission and consideration of facts [and] arguments," § 554(c)(1), and an opportunity to submit "proposed findings and conclusions" or "exceptions," § 557(c)(1), (2). See 5 U. S. C. § 554(a); 49 Stat. 548, 54 Stat. 913, formerly codified at 49 U. S. C. §§ 17, 305(h) (1976 ed.), repealed 92 Stat. 1466; 96 Stat. 2444. The determination in this case, however, was lawfully made by informal adjudication, the minimal requirements for which are set forth in the APA, 5 U. S. C. § 555, and do not include such elements. A failure to provide them where the Due Process

Clause itself does not require them (which has not been asserted here) is therefore not unlawful.

## IV

We conclude that the PBGC's failure to consider all potentially relevant areas of law did not render its restoration decision arbitrary and capricious.   We also conclude that the PBGC's anti-follow-on policy, an asserted basis for the restoration decision, is not contrary to clear congressional intent and is based on a permissible construction of § 4047.   Finally, we find the procedures employed by the PBGC to be consistent with the APA.   Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

· JUSTICE WHITE, with whom JUSTICE O'CONNOR joins, concurring in part and dissenting in part.

I join the Court's opinion except for the statement of the judgment and footnote 11.   In particular, I agree that the anti-follow-on policy at issue here is not contrary to the statute and that the PBGC would not have been prohibited from applying that policy as a basis for restoration in this case. Unlike the Court, however, I cannot read the notice of restoration as relying on the anti-follow-on policy and respondents' alleged improved financial position as alternative, independent grounds for restoration.   The notice, as I read it, clearly rested on both grounds in conjunction.   Furthermore, it would make good sense to rely on improved financial position, for without it there would be a risk of an early retermination of the plan.   At the very least, there is serious doubt about the matter, and if the Court of Appeals was correct that the PBGC's assessment of respondents' financial position was inadequate—and I think it was—the case should be remanded to the agency to consider whether the anti-follow-on plan by itself provides sufficient grounds for a restoration order.

I realize that the PBGC represented at oral argument that it had relied on its anti-follow-on policy and on respondents' improved financial condition as separate and independent grounds for the restoration, Tr. of Oral Arg. 25–26, but counsel's *post hoc* rationalizations are no substitute for adequate action by the agency itself.   See *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mutual Automobile Insurance Co.*, 463 U. S. 29, 50 (1983).   Nor may the PBGC's restoration order be upheld even though the agency might reach the same result on remand, relying only on the anti-follow-on policy.   "[The agency's] action must be measured by what [it] did, not by what it might have done. . . . The [agency's] action cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order as an appropriate safeguard for the interests protected by the Act."   *SEC* v. *Chenery Corp.*, 318 U. S. 80, 93–94 (1943).

I would therefore reverse the Court of Appeals in part, affirm in part, and remand with directions to return the case to the PBGC.

JUSTICE STEVENS, dissenting.

In my opinion, at least with respect to ERISA plans that the PBGC has terminated involuntarily, the use of its restoration power under § 4047 to prohibit "follow-on" plans is contrary to the agency's statutory mandate.   Unless there was a sufficient improvement in LTV's financial condition to justify the restoration order, I believe it should be set aside. I, therefore, would remand the case for a determination of whether that ground for the agency decision is adequately supported by the record.

A company that is undergoing reorganization under Chapter 11 of the Bankruptcy Code continues to operate an ongoing business and must have a satisfactory relationship with its work force in order to complete the reorganization process successfully.   If its previous pension plans have been involuntarily terminated with the consequence that the PBGC has

assumed the responsibility for discharging a significant share of the company's pension obligations, that responsibility by the PBGC is an important resource on which the company has a right to rely during the reorganization process. It may use the financial cushion to fund capital investments, to pay current salary, or to satisfy contractual obligations, including the obligation to pay pension benefits. As long as the company uses its best efforts to complete the reorganization (and, incidentally, to reimburse the PBGC for payments made to its former employees to the extent required by ERISA),[1] the PBGC does not have any reason to interfere with managerial decisions that the company makes and the bankruptcy court approves. Whether the company's resources are dedicated to current expenditures or capital investments and whether the package of employee benefits that is provided to the work force is composed entirely of wages, vacation pay, and health insurance, on the one hand, or includes additional pension benefits, on the other, should be matters of indifference to the PBGC. Indeed, if it was faithful to the statement of congressional purposes in ERISA, see *ante*, at 648, it should favor an alternative that increases the company's use and maintenance of pension plans and that provides for continued payment to existing plan beneficiaries. The follow-on plans, in my opinion, are wholly consistent with the purposes of ERISA.

According to the Court, the PBGC policy is premised on the belief that if the company cannot adopt a follow-on plan, the employees will object more strenuously (1) in the case of a

---

[1] At the time of the termination of the LTV plans, the PBGC was entitled to recover only 75 percent of the amounts expended to discharge LTV's pension obligations. The statute has since been amended to authorize a 100 percent recovery. LTV represents that if the restoration order is upheld, and if—as seems highly probable—it is promptly followed by another termination, the PBGC bankruptcy claim will increase from about $2 billion to more than $3 billion. Brief for Respondents LTV Corp. and LTV Steel 33, n. 21. The PBGC, of course, does not assert this change as a justification for the restoration order.

voluntary termination, to the "company's original decision to terminate a plan"; and (2) in the case of an involuntary termination, to the company's decision "to take financial steps that make termination likely." *Ante*, at 651. That belief might be justified in the case of a voluntary termination of an ERISA plan. Since the follow-on plan would be adopted immediately after plan termination, those who could object to the insurable event are also reasonably assured of receiving benefits when the insurance is paid.[2] That view is wholly unwarranted, however, in the case of an involuntary termination. The insurable event, plan termination, is within the control of the PBGC, which presumably has determined that the company does not have the financial resources to meet its current pension obligations. Even if the company could adopt a follow-on plan, the employees will be no less likely to object to the financial steps that will lead to plan termination because they would have no basis for belief that a union will insist on that course when, perhaps years later, the PBGC involuntarily terminates the plan. The safety that comes from a healthy pension plan will not be overcome by the hope that a future union will remember the interests of its retirees and former employees. Plan restoration in these circumstances is not a legitimate curative to the problem of moral hazard, but rather constitutes punishment of both labor and management for the imprudence of their predecessors.

In the case of an involuntary termination, if a mistake in the financial analysis is made, or if there is a sufficient change in the financial condition of the company to justify a reinstatement of the company's obligation, the PBGC should use its restoration powers. Without such a financial justification, however, there is nothing in the statute to authorize the PBGC's use of that power to prevent a company from creat-

---

[2] The three opinion letters identifying the PBGC policy concerning follow-on plans all involved voluntary terminations. See App. to Pet. for Cert. 159a, 165a, 172a. The restoration order entered in this case was unprecedented.

ing or maintaining the kind of employee benefit program that the statute was enacted to encourage.

Accordingly, I respectfully dissent.