973 F.2d 141
 Bankr. L. Rep. P 74,920
In re CHATEAUGAY CORPORATION, et al., Debtors.
The OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LTV
AEROSPACE AND DEFENSE COMPANY, Appellant,
v.
The LTV CORPORATION, LTV Aerospace and Defense Company,
Vought Industries, Inc. and Vought International,
Inc., et al., Appellees.
 No. 2224, Docket 92-5055.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 12, 1992.
Decided Aug. 24, 1992.
 
 Max O. Truitt, Jr., Washington, D.C. (William J. Perlstein, Stephen M. Cutler, Gregory S. Lane, Wilmer, Cutler & Pickering, Washington, D.C., Carla E. Craig, Steven M. Schwartz, Hertzog, Calamari & Gleason, New York City, of counsel), for appellant.
 Myron Kirschbaum, New York City (Michael J. Crames, Arlene R. Alves, Deborah S. Lewis, Kaye, Scholer, Fierman, Hays & Handler, Davis Polk & Wardwell, of counsel), for appellees.
 Carol Connor Flowe, Washington, D.C. (Jeffrey B. Cohen, James J. Armbruster, Pension Ben. Guar. Corp., Office of General Counsel, Charles G. Cole, Sara Hauptfuehrer, Frank H. McCulloch, Steptoe & Johnson, Washington, D.C., William Silverman, Otterbourg, Steindler, Houston & Rosen, New York City, of counsel), for appellee, the Pension Ben. Guar. Corp.
 Before: WINTER, MINER and McLAUGHLIN, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 The Official Committee of Unsecured Creditors of LTV Aerospace and Defense Company ("Aerospace Committee") appeals from Judge McKenna's order affirming the bankruptcy court's order of April 21, 1992, authorizing the sale of the aircraft division assets of LTV Aerospace and Defense Company ("Aerospace") pursuant to 11 U.S.C. § 363(b) (1988). We affirm.
 
 BACKGROUND
 
 2
 On July 17, 1986, The LTV Corporation ("LTV") and sixty-six of its subsidiary and affiliated companies, including Aerospace, each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101, et seq. (1988), and were continued as debtors in possession pursuant to Sections 1107 and 1108. These cases were consolidated for procedural purposes and are being jointly administered.
 
 
 3
 At the time of the bankruptcy filings, LTV Steel Company, Inc. ("LTV Steel"), the largest LTV debtor, was the sponsor of four underfunded pension plans. The Pension Benefit Guaranty Corporation ("PBGC") thereafter terminated the pension plans and pursuant to its statutory duties took over the plans' assets and liabilities. Upon such a termination, the employer becomes liable to the PBGC for any deficiencies that the PBGC had to pay. 29 U.S.C. § 1362 (Supp.1990). See generally, Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990). Subsequently, because LTV established a follow-on retirement program that resulted " 'in an abuse of the pension plan termination insurance system established by Title IV of ERISA' " and because of "LTV's 'improved financial circumstances,' " the PBGC restored three of the plans under Section 1347 of Title 29. PBGC, 496 U.S. at 643, 110 S.Ct. at 2674. The result of restoration was that the plans were ongoing and that LTV again would be responsible for administering and funding the plans.
 
 
 4
 Aerospace's common stock is owned by LTV, which also owns all of the stock in LTV Steel, the sponsor of the pension plans. Aerospace is, therefore, a member of LTV Steel's "controlled group" under ERISA, and thus, along with LTV and its subsidiaries, is jointly and severally liable for claims made against the pension funds upon termination. See 29 U.S.C. § 1362(a) (Supp.1990).[1] Accordingly, the PBGC filed bankruptcy claims against LTV Steel, as the contributing sponsor, and against each member of its controlled group, including Aerospace, for the amount underfunded in the still terminated plan and in the three restored plans, predicated on the contingency that one or all of the restored plans might terminate prior to confirmation of a plan of reorganization. These claims are valued by the PBGC at approximately $3 billion. As a result, over ninety percent of Aerospace's debt is to PBGC. Moreover, ERISA provides that all or part of PBGC's underfunding claim should be treated "in the same manner as a tax due and owing to the United States" in a case under the Bankruptcy Code. 29 U.S.C. § 1368(c)(2) (Supp.1990). PBGC thus has claimed various priorities under Section 507(a) of the Bankruptcy Code for these claims.
 
 
 5
 In light of the size, priority, and joint and several nature of PBGC's contingent and matured claims, LTV proposed a resolution of PBGC's claims on a global basis, rather than on an individual debtor basis. On May 1, 1991, LTV filed a proposed joint plan of reorganization. On May 20, 1991, LTV announced that it intended to sell Aerospace.
 
 
 6
 The United States Trustee subsequently appointed the Aerospace Committee as an official creditors' committee under Section 1102 of the Bankruptcy Code to serve as the representative of all unsecured creditors of Aerospace. The Aerospace Committee's request to file an individual plan was denied by the bankruptcy court. On February 14, 1992, the debtors filed The LTV First Modified Joint Plan of Reorganization that expressly incorporated the proposed sale of Aerospace.
 
 
 7
 On March 3, 1992, LTV filed an application in the bankruptcy court for authorization to transfer substantially all of the assets of Aerospace (the assets of its aircraft and missiles divisions) to Vought Corporation. On April 10, after a three-day hearing and bidding contest, the bankruptcy court approved a $150 million part-cash, part-securities bid by Carlyle Group ("Carlyle") for the aircraft division assets and a $300 million all-cash bid by an affiliate of Thomson-CSF, S.A. ("Thomson") for the missile division assets. Accordingly, on April 21, the bankruptcy court entered orders, pursuant to 11 U.S.C. § 363(b), authorizing and approving the transfer of the aircraft division assets to Carlyle and the missiles division assets to Thomson.
 
 
 8
 Chief Bankruptcy Judge Lifland concluded that the sale was appropriate because "the Debtors need to accomplish the Transaction because of the risk of loss of value of the Transferred Assets, their need for cash, and as a necessary step toward the confirmation of one [or] more Plans and their emergence from bankruptcy." Further, the court found that "the value to be received ... is the highest and best available." The court also held that "the Debtors [had] advanced good business reasons" for the sale and that it was "a reasonable exercise of each of the Debtors' business judgment to consummate a transfer of the Transferred Assets on the terms and conditions set forth in the Agreement." Finally, the court found that certain "restrictions on the transfer of the Preferred Stock imposed by the Agreement and this Order are reasonable." The orders provided that the consideration to be received by Aerospace be deposited in an escrow account and distributed only in accordance with a confirmed plan for Aerospace.
 
 
 9
 The Aerospace Committee appealed the two orders to the district court, which affirmed the bankruptcy court's orders. The district court noted that In re Lionel Corp., 722 F.2d 1063 (2d Cir.1983), defines "to what extent Chapter 11 permits a bankruptcy judge to authorize the sale of an important asset of the bankrupt's estate, out of the ordinary course of business and prior to acceptance and outside of any plan of reorganization." Id. at 1066. In Lionel, we adopted a rule that "requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application." Id. at 1071. Judge McKenna held that the bankruptcy court "correctly applied the legal standard set forth in Lionel," noting that the bankruptcy court had "considered the debtors' 'in-depth exploration of all viable alternatives,' ... the 'procedure ... properly calculated to obtain a fair and reasonable recovery for the assets in question,' ... the 'risk factors that are here,' ... the competing bid of [Vought] Corporation, and the interests of equity and the various creditor groups." Moreover, Judge McKenna found that the bankruptcy court considered the specific problems facing Aerospace, including uncertain future prospects for the aerospace industry, the decline in defense spending, and the joint and several liability of the LTV group for the $3 billion in PBGC claims. The court held that these related findings were not clearly erroneous.
 
 
 10
 The district court then held that placing the proceeds of sale in escrow, and the bankruptcy court's extension of the period within which the LTV debtors have the exclusive right under 11 U.S.C. § 1121 to file plans of reorganization, did not improperly prejudice the Aerospace Committee. Judge McKenna noted that the "Aerospace Committee remains free to attempt to convince the Bankruptcy Court ... to abandon the concept of a [global] plan ... and to allow the Aerospace Committee to file a plan for Aerospace alone."
 
 Finally, the district court concluded that
 
 11
 [t]he fact that $15 million of the total of $450 million to be paid for the assets of Aerospace is represented by preferred stock to be issued by Carlyle, and the fact that that stock is subject to certain conditions, does not, in the totality of the circumstances, suggest an abuse of discretion.
 
 
 12
 In the worse case scenario, these conditions would deprive creditors of even an indirect interest in the preferred stock. Nevertheless, the court stated that the bankruptcy court was "free to view [this] as a necessary component of the best available offer."
 
 
 13
 Subsequent to the district court's decision, on July 28, 1992, Thomson announced that it did not intend to proceed to a closing of the missiles division asset sale. Carlyle, however, announced its intention to proceed, and increased its acquisition price to approximately $190 million. At a hearing on August 14, after the argument of this case before us, the bankruptcy court approved the sale of Aerospace to Loral Corporation, Northrop Corporation, and Carlyle. The parties inform us that a closing may occur as early as August 31.
 
 DISCUSSION
 
 14
 The sales that gave rise to this appeal have been modified both as to terms and as to parties. Nevertheless, the dispute is not moot. The Aerospace Committee objects to any sale at all under present circumstances. Thus, "the dispute is one capable of repetition yet escap[ing] review because '(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again.' " Johnson Newspaper Corp. v. Morton, 862 F.2d 25, 30 (2d Cir.1988) (quoting Gannett Co., Inc. v. DePasquale, 443 U.S. 368, 377, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979)). In fact, the approval of another sale by the bankruptcy court on August 14 is just such a repetition, and the proposed closing a few days from now would prevent review of the new order. We therefore conclude the dispute is not moot and address the Aerospace Committee's objections to a sale.
 
 
 15
 The Aerospace Committee's objections are meritless. "First and foremost is the notion that a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code." In re Lionel, 722 F.2d at 1069. Thus, "a bankruptcy judge must have substantial freedom to tailor his orders to meet differing circumstances." Id.
 
 
 16
 Central to the Aerospace Committee's argument is that the district court treated the bankruptcy proceedings as substantively, rather than only procedurally, consolidated. We agree with appellants that a substantive consolidation would be inappropriate in this case. See In re Augie/Restivo Baking Co., 860 F.2d 515, 518-19 (2d Cir.1988). However, neither Chief Judge Lifland nor Judge McKenna held that the Aerospace Committee's interests must be merged with or subordinated to other creditors, as was the case in Augie/Restivo. They held only that an individual reorganization plan for Aerospace is not presently feasible, that a sale at this time is necessary to obtain maximum value for Aerospace's assets, and that the proceeds shall be held in escrow pending future proceedings.
 
 
 17
 With regard to the finding that an individual Aerospace plan is not feasible, the overriding fact is that no such reorganization plan is feasible unless PBGC agrees, which it will not presently do. PBGC's joint and several claims represent over ninety percent of Aerospace's debt, and, because PBGC and the other LTV creditors are currently pursuing a unified global plan--PBGC is an appellee on this appeal and asks us to affirm--the bankruptcy and district courts had no choice but to conclude that an Aerospace-only plan is presently not feasible.
 
 
 18
 What is presently feasible and necessary is a sale of Aerospace's assets. The courts below found that further delay risks that the assets will be sold later and for less. The Aerospace Committee does not seriously challenge those findings. It is true that delay might strengthen the Aerospace Committee's negotiating hand with PBGC, but only at the risk of diminishing the value ultimately to be obtained from Aerospace's assets. A sale now protects all creditors.
 
 
 19
 The bankruptcy court also concluded that restrictions on preferred stock necessary to realize certain tax benefits were a necessary component of the best available offer. As noted, these restrictions might deprive creditors of even an indirect interest in the preferred stock. Whether the new sale just approved contains such restrictions is unclear, but we will assume that it did and will address the issue. The bankruptcy court was within its discretion, based on its consideration of all the factors, including the potential tax benefits, the immediate need to maximize the assets' value, the closeness of a plan, and the small percentage of the overall assets involved (preferred stock represents only $15 million of the $450 million sale price, or 3.3%), to determine that a good business reason existed to proceed with the sale now even if the preferred stock amount does not ultimately benefit creditors. The finding that delay may so diminish the value of Aerospace's assets that creditors will lose more than the value of the preferred stock is supported by the record and justifies the bankruptcy court's decision.
 
 
 20
 By placing the proceeds in escrow, the distribution of the proceeds is appropriately left in a plan of confirmation.
 
 
 21
 Affirmed.
 
 
 
 [1]
 Section 4062(a) of ERISA states: "[A]ny person who is, on the termination date [of a pension plan], a contributing sponsor of the plan or a member of such a contributing sponsor's controlled group shall incur liability under this section." 29 U.S.C. § 1362 (Supp.1990). A "contributing sponsor" is a person who is responsible for meeting ERISA's minimum funding requirements with respect to the pension plan. 29 U.S.C. §§ 1301(a)(13), 1082 (Supp.1990). A "controlled group" is defined as a group of persons under "common control." 29 U.S.C. § 1301(a)(14)(A) (1988). Accordingly, ERISA enables PBGC to claim the full amount of the underfunding under a terminated plan from the contributing sponsor and all members of its controlled group. 29 U.S.C. § 1362(b) (Supp.1990)