**PHILADELPHIA TRAINING CENTER CORPORATION and PTC Career Institute of Georgia, Inc.**

v.

**STATE OF GEORGIA, Stephen Dougherty, in his official capacity as Executive Director of the Georgia Student Finance Commission, Georgia Higher Education Finance Commission, an agency of the State of Georgia, Georgia Higher Edu-cation Assistance Corporation a division of the Georgia Student Finance Commission, and Kitty McDonald, in her official capacity as Director, Georgia Higher Education Assistance Corporation.**

Civ. A. No. 92–3686.

United States District Court, E.D. Pennsylvania.

May 12, 1993.

**240**

Gloria M. Satriale, Philadelphia, PA, David O. Drake, Agoura Hills, CA, for Philadelphia Training Center.

Gloria M. Satriale, Philadelphia, PA, David O. Drake, Agoura Hills, CA, for PTC Career Institute of Georgia, Inc.

Virginia H. Miller, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, PA, Michael J. Bowers, Atlanta, GA, for defendants.

OPINION

PADOVA, District Judge.

■ This case presents an important question of first impression: Whether a "lender of last resort" under section 428(j) of the Higher Education Act of 1965, as amended (the "Act"), 20 U.S.C.A. § 1078(j) (West Supp.1993), may base its federal student loan lending decisions upon information disclosed in an applicant's credit history? The parties agree that this question is entirely legal in nature, and plaintiffs have accordingly filed a motion for partial summary judgment on this issue under Federal Rule of Civil Procedure 56(c). For the following reasons, I conclude that a "lender of last resort" under the Act may, in its discretion, base its federal student loan lending decisions upon information disclosed in an applicant's credit history, provid-

ed that consideration is also given to the applicant's past attempts to repay other debts (if any) and any financial or personal hardship the applicant may have experienced. I will therefore deny plaintiffs' motion.

I.

Plaintiffs Philadelphia Training Center Corporation ("PTC–Corporation") and PTC Career Institute of Georgia, Inc. ("PTC–Georgia") (collectively, "PTC") operate training centers in the State of Georgia for students interested in a variety of careers, including nursing assistant and secretarial specialist. Many of PTC's students (a majority of whom, PTC asserts, are impoverished, inner-city minorities) finance their training at PTC–Georgia through loans made available under the Robert T. Stafford Federal Student Loan Program ("Stafford Loan Program"), 20 U.S.C.A. §§ 1071 et seq. (West 1990 and West Supp.1993), and PTC has executed an agreement with the Secretary of the U.S. Department of Education making it eligible to participate in this program.

Among other things, the Stafford Loan Program provides for guarantees of student loans made under that program (currently known as Federal Stafford Loans ("FSLs")). 20 U.S.C.A. §§ 1071(a)(1)(D), 1078(b). Until June 30, 1992, FSLs made to PTC–Georgia students were guaranteed by the Pennsylvania Higher Education Assistance Agency ("PHEAA"), a state "guaranty agency" under the Act. See 20 U.S.C.A. §§ 1085(j), 1078(b). As of that date, however, PHEAA no longer guaranteed the FSLs of PTC–Georgia students. PTC subsequently looked to defendants State of Georgia, Stephen Dougherty, Georgia Student Finance Commission, Georgia Higher Education Assistance Corporation ("GHEAC")[1] and Kitty McDonald (collectively, "Georgia")[2] to guarantee its students' FSLs. Georgia refused, however, to admit PTC into its Guaranteed Student Loan Program ("GSL Program").

---

1. Like PHEAA, GHEAC is a state "guaranty agency" under 20 U.S.C.A. § 1085(j).

2. Stephen Dougherty, Executive Director of the Georgia Student Finance Commission, and Kitty McDonald, Director of the Georgia Higher Education Assistance Corporation, have been sued by PTC in their official capacities.

PTC–Corporation and its many subsidiaries, including PTC–Georgia,[3] had filed for bankruptcy protection and reorganization in this Court in January 1990, which matter was referred to the Bankruptcy Court for the Eastern District of Pennsylvania ("Bankruptcy Court").[4] When Georgia refused to admit PTC into its GSL Program, PTC initiated an adversary proceeding in the Bankruptcy Court to compel its admittance to the program under theories of, *inter alia*, violation of the Bankruptcy Code, 11 U.S.C.A. §§ 101 *et seq.* (West 1993), and 42 U.S.C.A. § 1983 (West 1981 & West Supp.1993). The reference of that proceeding was withdrawn upon the unopposed motion of Georgia, and the case proceeded in this Court under the above civil action number through a series of pretrial motions and entry of a Consent Order, pursuant to which Georgia agreed to begin processing FSL applications submitted by PTC–Georgia students as a "lender of last resort" under section 428(j) of the Act, 20 U.S.C.A. § 1078(j).

After entry of the Consent Order, the parties informed the Court that they had entered into a settlement agreement that would supersede the Consent Order and end further litigation. Pursuant to this settlement agreement, Georgia agreed, *inter alia*, to admit PTC–Georgia into the Georgia GSL Program and to process FSL applications submitted by PTC–Georgia students in accordance with the Act. Upon receiving information that the parties had settled their differences, I directed entry of an Order on October 15, 1992 dismissing this case with prejudice under Local Rule of Civil Procedure for the Eastern District of Pennsylvania ("Local Rule") 23(b).

Little more than one month later, PTC filed a motion under Local Rule 23(b) to vacate my Order of dismissal, reactivate this case, and declare Georgia in contempt of court, claiming that Georgia had already violated the terms of the settlement agreement. Among other things, PTC complained that Georgia, as a "lender of last resort" under the Stafford Loan Program, had failed to abide by its agreement to process PTC–Georgia student loan applications in accordance with the Act by refusing to make FSLs to certain students on the basis of their credit histories.[5] By Memorandum and Order dated February 5, 1993, I denied PTC's motion to hold Georgia in contempt; but, finding that it had shown sufficient cause under Local Rule 23(b), I granted PTC's motion to vacate my Order of dismissal and reactivate this case for the sole purpose of enforcing the terms of the settlement agreement.

## II.

PTC has filed a motion for partial summary judgment on the issue of whether Georgia, acting as a lender of last resort under the Stafford Loan Program, violated the Act and, accordingly, the settlement agreement by making FSL lending decisions on the basis of information disclosed in the students' credit history. The parties agree that (1) Georgia is a "lender of last resort" for purposes of the Stafford Loan Program; (2) Georgia agreed in the settlement agreement to process FSL applications submitted by PTC–Georgia students in accordance with the Act;[6] and (3) Georgia considers the cred-

---

**3.** PTC–Corporation operates similar training schools in other states.

**4.** On April 1, 1992, a plan of reorganization under Chapter 11 of the Bankruptcy Code for PTC and its subsidiaries was confirmed by the Bankruptcy Court.

**5.** The result of this practice, argued PTC, is that many PTC–Georgia students have been denied FSLs, causing great harm to PTC because its students depend heavily upon FSLs to finance their training at PTC, and because PTC depends heavily upon its students to stay in business and to perform its obligations under the plan of reorganization confirmed by the Bankruptcy Court.

**6.** That Georgia entered into such an agreement is of no small consequence. The Act may not provide a private cause of action to institutions of higher education. *See, e.g., St. Mary of the Plains College v. Higher Education Loan Program of Kansas, Inc.*, 724 F.Supp. 803 (D.Kan.1989). Had Georgia not agreed to process PTC–Georgia student FSL applications in accordance with the Act, PTC may have been barred from bringing suit simply on the basis of Georgia's alleged failure to comply with the Act. Because Georgia expressly agreed, however, to process FSL applications submitted by PTC–Georgia students in accordance with the Act, the terms of the Act were effectively incorporated into the settlement agreement, and the present action to enforce the

**242**

it history of PTC–Georgia students and has denied FSLs to certain PTC–Georgia students on the basis of their "derogatory" credit history, as determined by Georgia.[7] Thus the only issue before me is the legal question of whether the Act permits a lender of last resort under the Stafford Loan Program to base its FSL lending decisions upon information revealed in the applicant's credit history?

### A.

Congress has identified the following four purposes of the Stafford Loan Program: (1) "to encourage States and nonprofit private institutions and organizations to establish adequate loan insurance programs for students in eligible institutions"; (2) "to provide for a Federal program of student loan insurance for students or lenders who do not have reasonable access to a State or private nonprofit program of student loan insurance"; (3) "to pay a portion of the interest on loans to qualified students which are insured under [the Stafford Loan Program]"; and (4) "to guarantee a portion of each loan insured under a program of a State or of [an eligible] nonprofit private institution or organization." 20 U.S.C.A. §§ 1071 (West 1990). In addition to encouraging and/or providing for student loan insurance and student loan guarantees, and paying for a portion of interest on student loans, Congress also saw fit to provide in the Stafford Loan Program for lenders of last resort ("LLRs"). *See* 20 U.S.C.A. § 1078(j).

As recently amended, the LLR provision of the Stafford Loan Program states, in pertinent part, as follows:

**(1) General requirement—**

In each State, the guaranty agency or an eligible lender in the State ... shall make

loans ... to students eligible to receive interest benefits paid on their behalf under subsection (a) of this section who are otherwise unable to obtain loans under this part. ...

**(2) Rules and operating procedures**

The guaranty agency shall develop rules and operating procedures for the lender of last resort program designed to ensure that—

.        .        .        .        .

(C) appropriate steps are taken to ensure that borrowers receiving loans under the program are appropriately counseled on their loan obligations. ...

20 U.S.C.A. § 1078(j).

PTC contends that the mandatory language in this section that a LLR "shall" make FSLs to students who are "otherwise unable to obtain loans" clearly expresses Congress' intent that LLRs such as Georgia must make FSLs to students without regard to their credit history or any other consideration, so long as the students are otherwise eligible to receive the federal interest subsidies provided for under section 428(a) of the Act. And PTC correctly points out that neither section 428(a) nor the remainder of the Act requires that a student be creditworthy to receive federal interest subsidies or FSLs. *See* 20 U.S.C.A. §§ 1078(a), 1091 (West 1990 & West Supp.1993).[8] Indeed, argues PTC, Congress' intent in providing for "lenders of last resort" must have been to ensure that loans will be made to *all* eligible students "otherwise unable to obtain loans" from normal lending sources for a variety of reasons, including unfavorable credit history.

Georgia reads a different intent into the lender of last resort program. Georgia concedes that the Act does not *require* a FSL

---

settlement agreement may properly consider Georgia's compliance with the Act.

7. Georgia contests PTC's assertion that Georgia has denied FSL's to PTC–Georgia students on the basis of lack of credit, as opposed to poor credit. PTC, however, does not move for summary judgment on this factual question, and I need not resolve it at this time.

8. For a short time, there was one exception. The 1991 amendments to the Act required that FSLs

made to students over 21 years of age were insurable under the Stafford Loan Program only if the lender obtained a credit report on the applicant from a national credit bureau. *See* 20 U.S.C.A. § 1077(a)(2)(A)(i)(West Supp.1993). This provision was repealed, however, by the 1992 amendments to the Act. *See* Higher Education Amendments of 1992, Pub.L. No. 102–325, Title IV, § 414(a), 106 Stat. 513.

applicant to be creditworthy, but argues that FSL lenders, including LLRs, *may*, in their discretion, take a student's credit history into consideration in their lending decisions. In support, Georgia points out that section 428(a), which is expressly referred to in the lender of last resort provision, contains the following language:

**(6) Assessment of borrower's financial condition not prohibited or required**

Nothing in this chapter or any other Act shall be construed to prohibit or require, unless otherwise specifically provided by law, a lender to evaluate the total financial situation of a student making application for a loan under this part, or to counsel a student with respect to any such loan, or to make a decision based on such evaluation and counseling with respect to the dollar amount of any such loan.

20 U.S.C.A. § 1078(a)(6). This language, Georgia contends, expressly permits all lenders, including LLRs, to take credit history into consideration in their sole discretion. The intention of Congress in providing for LLRs, Georgia argues, was not to ensure that FSLs are made to every student who applies, regardless of his or her financial situation, but simply to ensure that Stafford Loan Program lenders are available in every state of the Union.

PTC responds that section 428(j) is an example of where Congress "otherwise specifically provided by law," as required by section 428(a)(6), that lenders, in particular LLRs, are prohibited from considering a student's credit history. To read section 428(j) differently, PTC contends, would be to render null the language in that section that an LLR "shall" make FSLs to students "otherwise unable to obtain loans."

### B.

Read side-by-side, sections 428(j) and 428(a)(6) of the Act create significant ambiguity regarding the discretion of LLRs to consider credit history in their FSL lending decisions. The mandatory language in section 428(j) that an LLR "shall" make FSLs to students otherwise unable to obtain them appears to require that LLRs make FSLs without regard to any consideration other than the specific eligibility requirements enumerated in the Act. The equally strong language in section 428(a)(6), on the other hand, which is referred to in section 428(j), makes clear Congress' intent to preserve, unless "otherwise *specifically* provided" (emphasis added), the discretion of *all* FSL lenders to consider a student's financial situation in their lending decisions.

Moreover, a recent amendment to section 428(j) suggests that, contrary to PTC's contention, Congress did not *specifically* provide otherwise for lenders of last resort. The 1992 amendment to section 428(j) *specifically requires* that guaranty agencies "develop rules and operating procedures for the lender of last resort program designed to ensure that ... borrowers receiving loans under the program are appropriately counseled on their loan obligation...." 20 U.S.C.A. § 1078(j) (West Supp.1993). Though not related to credit considerations, this additional requirement perhaps indicates what Congress had in mind by "unless otherwise specifically provided." Recall that section 428(a)(6), quoted above, states that nothing in the Stafford Loan Program shall be construed to prohibit or require consideration of a student's financial condition *or student counseling regarding his or her loan obligations*. That this recent amendment to section 428(j) specifically requires student counseling while the remainder of the section and the amendment are silent as to credit history suggests that Congress meant just what it said in section 428(a)(6): Unless it specifically (and, perhaps, affirmatively) states otherwise, all lenders, including LLRs, may consider credit history at their discretion.

To resolve the ambiguity created by the express language of the statute, I have consulted, first, the legislative history of the LLR program to determine whether Congress has directly spoken on this issue and, second, interpretations of the Act provided

by the Executive Branch official charged with its administration—the Secretary of the U.S. Department of Education (the "Secretary").[9] *See, e.g., Pension Benefit Guaranty Corp. v. LTV Corp.,* 496 U.S. 633, 646–52, 110 S.Ct. 2668, 2676–79, 110 L.Ed.2d 579 (1990); *Chevron, U.S.A., Inc. v. National Resources Defense Counsel,* 467 U.S. 837, 842–43, 859–66, 104 S.Ct. 2778, 2781–82, 2790–93, 81 L.Ed.2d 694 (1984). After conducting my own research and reviewing the parties' submissions, I conclude that (1) the legislative history of the LLR program does little to resolve the ambiguities created by the statute; and (2) the Secretary has promulgated regulations, entitled to deference from this Court, that resolve the ambiguity in favor of LLR discretion to consider an FSL applicant's credit history.

1.

The LLR program was created by the 1980 amendments to the Higher Education Act. *See* Education Amendments of 1980, Pub.L. No. 96–374, 94 Stat. 1418, 20 U.S.C. § 1078(h)(1) (Supp. IV 1980). It has been amended three times since: in 1986, 1987 and 1992. *See* Student Financial Assistance Amendments of 1985, as passed by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Pub.L. No. 99–272, Title XVI, § 16016, 100 Stat. 343;[10] Higher Education Technical Amendments of 1987, Pub.L. No. 100–50, § 10(m), 101 Stat. 341–43; Higher Education Amendments of 1992, Pub.L. No. 102–325, Title IV § 416(r), 106 Stat. 516–529, 20 U.S.C.A. § 1078(j) (West Supp.1993).

The original version of the LLR program provides, in pertinent part, that "[f]rom sums advanced by the [Student Loan Marketing Association] . . . each State agency and non-profit private institution or organization with which the Secretary has an agreement . . . *is authorized to make loans* directly to students otherwise unable to obtain [FSLs]. . . ." 20 U.S.C. § 1078(h)(1) (Supp IV 1980)(emphasis added). The significant difference between this version and the current version of section 428(j) is, as emphasized in the quoted text, that this version is phrased in more permissive language, versus the mandatory "shall make loans" that appears in the current version.

Initially proposed by the Senate, *see* S. 1839, 96th Cong., 2d Sess. (1980), the original version was incorporated by a Joint Conference Committee into the House of Representatives bill (H.R. 5192) ultimately passed and enacted. *See* H.R.Conf.Rep. No. 1337, 96th Cong., 2d Sess. (1980), *reprinted in,* 1980 U.S. Code Cong. & Admin. News ("USCCAN") 3141, 3225, 3246. A report prepared by the Senate Committee on Labor and Human Resources accompanying S. 1839, the only report to substantively address the 1980 version, explains that in proposing the LLR program, "the Committee was concerned that, in these times of high interest rates and stringent credit limitations, many students might not be able to obtain needed loans through private lenders." S.Rep. No. 733, 96th Cong., 2d Sess. 32 (1980)("1980 Senate Report"). This brief explanation of the concerns out of which arose the LLR program does not in any way address whether LLRs may consider a student's credit history and supports both parties' positions in this case regarding the purpose of the LLR program. The Committee can be understood to have supported the LLR program in response to increasing credit standards that were making scarce loans to

---

9. Congress has expressly delegated to the Secretary the functions, powers and duties to, *inter alia,* "prescribe such regulations as may be necessary to carry out the purposes of . . . [the Stafford Loan Program and] to establish minimum standards with respect to sound management and accountability of . . . [the various subprograms that comprise the Stafford Loan Program]." 20 U.S.C.A. § 1082(a)(1) (West Supp. 1993).

10. The Act was generally revised later in 1986, after COBRA was passed, by the Higher Education Amendments of 1986. *See* Pub.L. No. 99–498, 100 Stat. 1269. This general revision, which reauthorized the LLR program, did not substantively change the program.

less creditworthy students; or it can be read as responding to a need for more FSL lenders in general because of increasing interest rates and credit tightening, presumably making other investments more attractive to banks.[11] In any event, the fact that the language in the 1980 version is permissive, rather than mandatory, indicates, in light of the clear language preserving lender discretion contained in then-existing section 428(a)(6),[12] that Congress most likely did not intend to forbid LLRs from taking credit history into consideration in making loans.

As part of the blizzard of statutory changes that accompanied COBRA, the 1980 version of section 428(j) was first amended in 1986. Deleting the "is authorized to make loans" language from the original version, this amendment added the current "shall make loans" language. Unfortunately, nei-

ther my research nor the parties' submissions have uncovered pertinent legislative history explaining this seemingly significant change in the LLR program. We are left to speculate whether this new mandatory language was meant to divest LLRs of their discretion to consider an applicant's credit history or simply to ensure that LLRs actually exercise the authority given them in 1980 to make FSLs in due course.[13]

The final two amendments to the LLR program—made in 1987 and 1992—bear little upon the question at hand;[14] nor does their accompanying legislative history. The most relevant piece of legislative history of which I am aware regarding either of these amendments is in the form of remarks made by Senator Simon contemporaneous with the 1992 amendments, stating that these amendments "strengthen[ ] the lender-of-last-resort

---

**11.** Both readings of the Committee Report are supported by similar concerns expressed by the House of Representatives Committee on Education and Labor ("House Committee") in reporting on the House Bill (H.R. 5192) that was ultimately passed in lieu of S. 1839 after receding to the LLR provision contained in S. 1839. Among the problems identified by the House Committee in the then-existing Guaranteed Student Loan Program (now the Stafford Loan Program) were (1) "shortages of student loan capital in individual states or localities" and (2) "[w]here the problem of student loan capital availability is not so severe ... isolated students [are having] trouble finding a lender." H.R.Rep. No. 520, 96th Cong., 2d Sess. at 31, *reprinted in*, 1980 USCCAN 3141, 3171. The House Committee proposed to solve these problems by implementing direct lending to students by the Student Loan Marketing Association and a "lender referral service" to be operated by state guarantee agencies. *See id.*

**12.** Section 426(a)(6) has remained unchanged throughout the 1980, 1986, 1987 and 1992 amendments to the Act.

**13.** As stated at note 10, *supra*, the LLR program was reauthorized without substantive change later in 1986 as part of the Higher Education Amendments of 1986. A Report prepared by the Senate Committee on Labor and Human Resources regarding these amendments, makes the following statement concerning the LLR program:

> While lack of access to student loans is no longer seen as a problem in the Guaranteed

Student Loan program, concerns were raised at our hearings about potential problems during unstable and unsure economic times. Therefore, the Committee bill establishes that in each state, either the guarantee [sic] agency or an eligible lender will act as a lender of last resort for students who are unable to obtain loans otherwise.

S.Rep. No. 296, 99th Cong., 2d Sess. 29–30 (1986). This explanation for reauthorization of the LLR program does not address whether LLRs may take credit history into consideration in their FSL lending decisions, and its general statements about the reasons underlying reauthorization of the LLR program, like the 1980 legislative history, can be read as favoring either party's positions in this case.

**14.** The 1987 amendments simply added that guaranty agencies must consider the requests of eligible lenders to act as LLRs. *See* Higher Education Technical Amendments of. 1987, Pub.L. No. 100–50, § 10(m), 101 Stat. 341–43. The 1992 amendments added a host of requirements regarding the establishment of rules and operating procedures for the LLR program and delineated circumstances when a LLR need not make FSLs to students who attend particular schools. *See* Higher Education Amendments of 1992, Pub.L. No. 102–325, Title IV § 416(r), 106 Stat. 516–529. As noted above, *see supra* pages 10–11, an argument can be made that the 1992 amendment evidences what Congress meant in section 426(a)(6) by "unless otherwise specifically provided."

program, in which guaranty agencies help provide loans to students not well served by banks." 138 Cong.Rec. S9262, S9267 (1992). As with the legislative history quoted above regarding the 1980 version of the LLR program, these remarks, though shedding some light on the purpose of the LLR program, simply do not go to whether LLRs may or may not consider an applicant's credit history in their FSL lending decisions.

### 2.

Having examined the Act and the relevant legislative history of the LLR program, I conclude that the Act is ambiguous and that Congress has not directly spoken on the specific issue of whether LLR's may consider credit history in their FSL lending decisions. Rather than simply impose my own construction of the LLR program in this instance, however, as I am urged to do by PTC, I must consider whether the agency that administers the Act has resolved this issue "based upon a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782 (footnote omitted). I conclude that it has.

As stated above, Congress invested the Secretary of the U.S. Department of Education with broad authority and responsibility to promulgate regulations to carry out the purposes of the Stafford Loan Program. *See supra* note 9. On December 18, 1992, the Secretary promulgated the following amendment to 34 C.F.R. § 682.401(c)(1992):

(1) *Lender of last resort.* The guaranty agency shall ensure that it or an eligible lender . . . serves as a lender of last resort in the State in which it is the principal guaranty agency. . . .

(2) The lender of last resort shall make a Stafford loan to any eligible student who *satisfies the lender's eligibility requirements* and—

(i) Qualifies for interest benefits pursuant to § 682.301 . . .; and

(ii) Has been otherwise unable after conscientious efforts to obtain a loan from another eligible lender for the same period of enrollment. . . .

57 Fed.Reg. 60,280, 60,347 (to be codified at 34 C.F.R. § 682.401(c)) (emphasis added).[15]

I read this regulation as making absolutely clear that, at least according to the Secretary, LLRs may, in their discretion, impose their own borrower eligibility requirements. And as there appears no restriction in the regulation on credit-based eligibility requirements, I also conclude that the Secretary reads the Act as authorizing LLRs to take into consideration an FSL applicant's credit history.

■ Because the Secretary's construction of the Act directly answers the question at hand, I must defer to the Secretary's view if it is "rational and consistent with the statute." *NLRB v. Food & Commercial Workers,* 484 U.S. 112, 123, 108 S.Ct. 413, 416, 98 L.Ed.2d 429 (1987); *see also Chevron,* 467 U.S. at 845, 104 S.Ct. at 2783. The preamble to the above regulation does not set forth the basis for the Secretary's construction of the LLR program. Insight into the Secretary's reasoning, however, appears in an opinion letter predating the regulation, from Acting Assistant Secretary of the U.S. Department of Education Michael J. Farrell to Congressman Lindsay Thomas. The letter was apparently sent to Congressman Thomas in response to his inquiry on behalf of a an individual who had been denied an FSL by Georgia, then acting as a LLR. Assistant Secretary Farrell states, in relevant part, as follows:

An otherwise qualified student who is unable to obtain a Stafford Loan through an eligible lender may apply for a subsidized Stafford Loan through a designated lender of last resort (LLR). . . . Section 428(a)(6) of the Act permits a participating lender to evaluate the total financial situation of a student applying for a Stafford Loan and to decline to make a loan based on such an evaluation. In this respect, a LLR is no different from any other eligible lender. A LLR may perform a check of the applicant's credit history, require an endorser (co-signer), and decline to make a loan based on the information revealed. The

---

15. The highlighted text in (c)(2) above has been added to the preceding version of 34 C.F.R. § 682.401(c), which was identical in all other respects.

Secretary does expect a LLR, in deciding whether to make a loan to such an applicant, will give consideration to the applicant's past attempts to repay other debts (if any), and to any financial or personal hardship the applicant may have experienced.

■ Although this opinion of the Assistant Secretary is not part of the public record developed in connection with the above regulation, I am permitted to consider it as evidence of the Secretary's policy and reasoning, particularly so in this instance because the opinion is consistent with the Secretary's published regulations. *Cf. LTV Corp.*, 496 U.S. at 642–43, 110 S.Ct. at 2674 (deferring to opinion letters issued by the Pension Benefit Guaranty Corporation); *Ciba–Geigy Corp. v. U.S. Envtl Protection Agency*, 801 F.2d 430, 437 (D.C.Cir.1986) (treating letter from head of U.S. Environmental Protection Agency's Pesticide Division as formal agency interpretation of statute and finding said letter to be final agency action for purposes of judicial review). The Farrell opinion letter indicates that the Secretary views section 428(a)(6) as, in effect, taking precedence over anything to the contrary in section 428(j), permitting LLR consideration of a student's credit history. But not without limitation: The Secretary expects that consideration be given, beyond the face of a credit report, to an applicant's past attempts to repay debts and any financial or personal hardship.

I find this view of the LLR program to be rational and consistent with the Act. As I have stated throughout the above discussion, the LLR provision of the Act is, on its face, susceptible to two interpretations, neither of which are inconsistent with either the purposes of the LLR program or the Act. It is entirely plausible that Congress meant nothing more by the addition of "shall make loans" to section 428(j) than that guaranty agencies or other eligible lenders are required to exercise their prior authority to make direct loans to students otherwise unable to obtain them. It is also entirely plausible that Congress meant exactly what it said in section 428(a)(6) about preserving lender discretion "unless otherwise specifically provided"; and the recent amendment to section 428(j) certainly demonstrates that Congress knows how to legislate in a manner consistent with this language. Further, the Secretary's admonition, expressed in the Farrell letter, that LLRs must consider an applicant's *total* situation when taking credit history into account seems a reasonable accommodation of Congress' policy of helping students "that might not be able to obtain needed loans through private lenders," *see* Senate Report at 32, and Congress' equally strong policy of preserving lender discretion.

Having concluded that the Secretary's construction of the LLR program and the Act represents a reasonable accommodation of competing interests and competing statutory language, I must defer; the policy arguments asserted by the parties in favor of one interpretation or another are more properly addressed to the Legislative or Executive Branches. *See Chevron*, 467 U.S. at 864–65, 104 S.Ct. at 2792–93. Accordingly, I find that LLRs may take an applicant's credit history into consideration in their FSL lending decisions, and I will, therefore, deny PTC's motion for summary judgment.