CRUZ R. RAMOS GONZALEZ
Peticionario

v.

ADMINISTRACION DE CORRECCION, COMITE DE CLASIFICACION Y TRATAMIENTO, CENTRO DE DETENCION DEL OESTE, ABC Y HIJ

Núm. KLRA-98-00649

San Juan, Puerto Rico, a 13 de mayo de 1999

Panel integrado por su Presidenta, la Juez Alfonso de Cumpiano
y los Jueces Aponte Jiménez y Giménez Muñoz

Aponte Jiménez, Juez Ponente

### TEXTO COMPLETO DE LA SENTENCIA

El Comité de Clasificación y Tratamiento de la Administración de Corrección a cargo de clasificar el nivel de custodia de los confinados decidió mantener al recurrente, Cruz R. Ramos González, en custodia mediana en lugar de custodia mínima como éste así lo solicitó. Por estar en desacuerdo con tal determinación, recurre ante nos. Aduce que erró la Administración de Corrección al asignarle la clasificación de custodia mediana apoyándose en criterios que ya habían sido adjudicados en evaluaciones anteriores y al basarse en el factor de riesgo de fuga por una tentativa de fuga adjudicada a su favor por un tribunal. Solicita que lo clasifiquemos en un nivel de custodia mínima.

El Procurador General se opone. Reclama que procede la desestimación del recurso instado por razón de que la Ley de Procedimiento Administrativo Uniforme (L.P.A.U.) no es de aplicación a los procedimientos informales de determinación de nivel de custodia que se guían, como aquí, por los criterios y normas propias de la Administración de Corrección. Según su tesis, la L.P.A.U. establece que se regirán por dicha ley las controversias que de acuerdo a una ley, regla o reglamento, o de la propia ley, deban adjudicarse a través de un procedimiento formal. Argumenta que los cambios de nivel de custodia no son de naturaleza adversativa en tanto no adjudican derechos constitucionales de los confinados ni afectan un interés de libertad. Descansa, entre otros, en *Hewitt v. Helms,* 459 U.S. 460, 74 Ed. 2d. 675 103 S Ct 864 (1983), resuelto por el Tribunal Supremo federal, un caso en que dicho foro decidió que las personas encarceladas retienen sólo un margen pequeño de interés libertario protegido y que una segregación carcelaria no involucra un interés independientemente protegido por la cláusula del Debido Proceso de Ley.

Antes de proceder con las alegaciones del confinado, Cruz R. Ramos González, debemos entrar a considerar el planteamiento del Procurador General al respecto, particularmente cuando nos topamos con visiones disímiles adoptadas por varios paneles de este Tribunal sobre el tema. Los autos reflejan que el referido confinado fue ingresado en la cárcel para cumplir sentencias de veintidós (22) años impuestas por los delitos de asesinato en segundo grado, robo e infracción al Art. 404-A de la Ley de Sustancias Controladas. Previamente, fue convicto por los delitos de robo, e infracción a los Artículos 6 y 7 de la Ley de Armas de Puerto Rico. Le fue concedida una libertad a prueba que luego le fue revocada. Posteriormente, estando cumpliendo, se le concedió la libertad bajo palabra. Mientras disfrutaba de ese privilegio fue sentenciado nuevamente por la comisión de otro delito público, violando así las condiciones de la libertad que disfrutaba. Por esa razón, el 12 de agosto de 1992, la Junta de Libertad Bajo Palabra se la revocó.

El 29 de octubre de 1996, fue acusado por haberse fugado mientras se encontraba cumpliendo una pena de reclusión en el campamento penal Punta Lima. Surge del expediente una solicitud de requisitoria sobre prófugos y una hoja de incidentes en la cual se indica que el confinado ingresa capturado el 28 de febrero de 1997. En cuanto a la denuncia de fuga, una sala del Tribunal de Primera Instancia determinó, el 25 de junio de 1997, que no existía causa probable. De los autos surge que el 15 de septiembre de 1997 el confinado se declaró culpable por dos infracciones a la Ley de Armas.

El 12 de junio de 1997, el Comité de Clasificación y Tratamiento (Comité) le realizó una evaluación. Lo clasificó en custodia mediana. Adujo como fundamento, que éste tenía casos pendientes por Ley de Armas y Fuga; historial de adicción; y que los delitos por los que cumple son de naturaleza grave y extrema violencia. El 6 de octubre de 1998, lo evaluó nuevamente. Decidió mantenerlo en custodia mediana. Algunos de los fundamentos dados para dicha determinación fueron: que era como medida de tratamiento; cumple alta sentencia por delitos de naturaleza grave y violenta, la cual ha interrumpido al violar libertad a prueba y libertad bajo palabra y al incurrir en la comisión de nuevos delitos; y constituye un riesgo de evasión. Luego de evaluar la posición de las partes y por las consideraciones que a continuación exponemos, resolvemos que aun cuando la L.P.A.U. aplica a la situación que nos ocupa, denegamos el dejar sin efecto la resolución recurrida.

Es política pública reglamentar las instituciones penales para que sirvan sus propósitos en forma efectiva y a la vez propender, dentro de los recursos disponibles, el tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social, Sección 19 del Artículo VI de la Constitución del Estado Libre Asociado. La determinación del nivel de custodia al que será asignado un recluso entre máxima, mediana o mínima, es parte de su rehabilitación. Le brinda en mayor o menor grado su integración con los demás reclusos y con la sociedad en general motivando así su rehabilitación. En el caso de custodia mediana, el grado de supervisión requiere un menor uso de controles externos para con el confinado que le permiten convivir con otros. En cuanto a la mínima, se entiende que el confinado puede funcionar con un mínimo de controles internos y su circulación dentro o fuera de la institución no representa peligro para la población penal, los empleados o para la comunidad. Regla 10(C) del

Manual de Reglas Para Crear y Definir Funciones del Comité de Clasificación y Tratamiento en las Instituciones Penales (Manual de Reglas). El sistema de clasificación constituye parte de la rehabilitación y adaptación gradual del confinado.

El Art. 7 de la Ley Orgánica de la Administración de Corrección, Ley Núm. 116 de 22 de julio de 1974 (4 L.P. R.A. sec. 1121), exige que todos los convictos por delitos graves sean sometidos a evaluaciones periódicas a los fines de conocer y analizar su situación física, emocional y mental, historial delictivo, e identificar sus capacidades, intereses, motivaciones, controles y limitaciones con el propósito de clasificarlos para determinar el plan de acción a tomar en cada caso en armonía con los principios de tratamiento individualizado y seguridad pública. Dispone además que se explicará al cliente el propósito y los resultados de las evaluaciones practicadas, a excepción de aquella información que se haya determinado mediante reglamentación al efecto que sea de carácter confidencial, 4 L.P.R.A. Sec. 1121(e).

Como parte integral de la más alta prioridad que goza la rehabilitación moral y social de los confinados, 4 L.P. R.A. sec. 1112(b), la Administración de Corrección ha creado un Comité que tiene como uno de sus objetivos formular la reglamentación interna necesaria para los programas de diagnóstico, clasificación, tratamiento y rehabilitación de la clientela del sistema correccional. Entre las funciones y poderes del Comité se encuentran estudiar la situación de cada confinado con el fin de identificar sus necesidades, capacidades e intereses al igual que limitaciones, conocer su funcionamiento social, clasificarlo y trazarle un plan de tratamiento institucional, Regla 8(1) del Manual de Reglas, *supra*. Conforme se establece en dicho cuerpo reglamentario, el plan de tratamiento institucional asignado podrá ser evaluado periódicamente, según, entre otros, lo establezca el Comité en cada caso. Regla 8(2). El Comité también tiene facultad de revisar sus determinaciones anteriores cuando existan razones fundamentadas para ello, Regla 8(13).

Como dicho antes, la clasificación de un recluso propende hacia su más eficaz rehabilitación, lo cual es política pública establecida en nuestra Constitución. El objetivo que persigue el sistema de clasificación de custodia de confinados implantado por el Departamento de Corrección es constatar precisamente los requisitos y grados de seguridad y supervisión para cada persona confinada. Capítulo 8 del Manual de Clasificación del Confinado de 1 de febrero de 1989 adoptado por la Administración de Corrección (Manual del Confinado). Los factores a tomarse en consideración al momento de clasificar a un confinado son los siguientes: tipo de arresto, severidad del delito actual, duración estimada de encarcelación, tipos de confinamientos anteriores e historial de fugas o intentos de fugas, y el ajuste institucional. Capítulo 8 del Manual del Confinado. Los acuerdos del Comité deberán estar fundamentados por hechos e información sometida a su consideración donde se acredite la necesidad de la acción que se aprueba o recomienda. Regla 5 del Manual de Reglas.

No cabe duda que las evaluaciones periódicas que realiza el Comité referente a la clasificación de custodia de los confinados, a la luz de lo anterior, son derechos que éstos tienen creados por ley a tono con la política pública enunciada. Dependiendo del nivel de custodia se le permite al confinado más libertades. Igualmente, el nivel de custodia en el cual deben mantenerse determina unos privilegios. El encontrarse clasificado en custodia mediana y no mínima inhabilita a un confinado acogerse a algunos de los permisos que se le ofrecen como grupo para salir sin custodia fuera de las instituciones penales. Art. VI(H) del Reglamento para la Concesión de Permisos a los Confinados para Salir o Residir Fuera de las Instituciones Penales del Estado Libre Asociado, Reglamento Núm. 4851 adoptado el 2 de diciembre de 1992. Es decir, no sólo estamos ante un derecho que se le concede a los confinados de ser evaluados periódicamente, sino también de unos privilegios que conlleva ser ubicado en ciertas clasificaciones.

Tampoco hay duda, pues, de que una vez encarcelado, el recluso tiene una expectativa de que su caso sea evaluado periódicamente para determinar su nivel de confinamiento y a obtener ciertos derechos y privilegios de acuerdo a ese nivel. Al darse un cambio de nivel de custodia, las condiciones de confinamiento cambian, alterando

también los privilegios y derechos que éstos tienen. Establecido dicho procedimiento y prioridades, el confinado adquiere un interés libertario.

Referente a la L.P.A.U., dicha ley expresamente establece las agencias que están exceptuadas de su aplicación. La Administración de Corrección no es una de ellas, 3 L.P.R.A. Sec. 2102, por lo que le aplica. De la misma manera, en su Art. 1.4 (3 L.P.R.A. sec. 2103), dispone dicha ley que ésta se aplicará a todos los procedimientos administrativos conducidos ante todas las agencias que no estén expresamente exceptuados por la misma. De otra parte, el Art. 1.3(b) (3 L.P.R.A. sec. 2102 (b)), define adjudicación como el pronunciamiento mediante el cual una agencia determina los derechos, obligaciones o privilegios que correspondan a una parte. Tratándose de derechos y privilegios concedidos a los confinados, el Comité, al hacer su evaluación y decidir en relación con la clasificación de los confinados para fines de determinar su custodia, lo que realmente realiza es una determinación enmarcada dentro de la definición de adjudicación contenida en la L.P.A.U.

Siendo los confinados una parte, conforme la definición de la L.P.A.U. que incluye para su aplicación como parte a *"toda persona o agencia autorizada por ley a quien se dirija específicamente la acción de una agencia o que sea parte en dicha acción",* 3 L.P.R.A. sec. 2102(j), y pudiendo dicha parte afectada por una orden o resolución final de una agencia y que haya agotado todos los remedios provistos por la agencia, presentar una solicitud de revisión ante este Foro, 3 L.P.R.A. sec. 2172, la adjudicación de la Administración de Corrección relativa a la clasificación de los confinados es, pues, susceptible de ser revisada judicialmente. Acorde con esto, la L.P.A.U. le confiere a este Tribunal autoridad para revisar las decisiones de las agencias administrativas que afecten de una u otra forma los derechos o privilegios de una persona que haya sido parte en un procedimiento ante una agencia, ya se trate de uno formal o informal.

Igualmente, no se trata aquí tampoco de una mera reglamentación interna procesal de la agencia como lo apunta el Procurador General. La L.P.A.U. define regla o reglamento, en ese contexto, como cualquier norma o conjunto de normas de una agencia que sea de aplicación general y que ejecute o interprete la política pública o la ley, o que regule los requisitos de los procedimientos o prácticas de una agencia. 3 L.P.R.A. sec. 2102(l). Las aludidas reglas que rigen lo concerniente a la clasificación de custodia de los confinados ejercen un control sobre la población y las cuestiones de seguridad y rehabilitación. Afectan no sólo a la población penal dentro de la institución, sino también a la fuera de ella. Las mismas establecen un procedimiento para regular el procedimiento en la adjudicación relacionada con unos derechos y privilegios de los confinados contemplados en la propia política pública que fomenta hacer posible la rehabilitación moral y social de éstos.

En base a lo anterior, no podemos cerrar las puertas a los reclusos sosteniendo que la determinación del Comité, la cual podría ser una irrazonable o totalmente injustificada, es final negándole así la oportunidad de recurrir a los tribunales para su revisión. Esto le daría discreción absoluta a dicho organismo para tomar decisiones sobre el nivel de custodia del confinado sin tener derecho a que esa determinación sea revisada judicialmente. Negarle ese derecho equivaldría a permitir que decisiones que podrían ser tomadas arbitrariamente evadan el escrutinio judicial al cual está sometido toda determinación administrativa conforme los parámetros de la L.P.A.U. Entendemos que un confinado debe tener derecho a que este Foro revise las decisiones del Comité, ya que no sólo se le podría estar privando del privilegio de encontrarse clasificado en cierto nivel de clasificación, sino también limitando su oportunidad de aprovecharse de otros privilegios a los que sería elegible de encontrarse clasificado en un nivel de clasificación más favorable.

Otro fundamento que favorece la aplicación de un vehículo de revisión judicial en relación con los procedimientos del Comité se encuentra en la sección 5.4 de la L.P.A.U., 3 L.P.R.A. sec. 2184. La misma establece que *"[t]oda persona a la que una agencia deniegue la concesión de una licencia, franquicia, permiso, endoso, autorización o gestión similar tendrá derecho a impugnar la determinación de la agencia por medio de un procedimiento adjudicativo, según se establezca en la ley especial de que se trate y en las secs. 2151 a 2168 de*

*este título".* A nuestro juicio, este caso trata de la denegatoria de una autorización o de una gestión similar a la de una autorización como lo es estar bajo la clasificación de un nivel mediano. Siendo una gestión similar, nos parece que los confinados tienen derecho a impugnarla para, si luego de ser procesada administrativamente mediante los mecanismos de adjudicación formal o informal con que cuenta la agencia, continúa adversa, y pueda ser revisada por el foro judicial. El hecho de que se trate de un procedimiento informal ante la agencia, no impide su revisión judicial en el momento apropiado.

Ahora bien, debido a la necesidad de cumplir con unos procedimientos que generen una decisión más definida, previo a recurrir al Tribunal, particularmente cuando nos encontramos ante un procedimiento de carácter informal como el que nos ocupa, se han desarrollado unas teorías que regulan la llegada de los casos al cauce judicial. La justiciabilidad es norma jurídica que autoimpone a los tribunales ciertos límites en el ejercicio de su autoridad. Esa doctrina recoge diversas manifestaciones las cuales se agrupan y categorizan en atención a distintos requisitos. La doctrina de madurez es una de estas manifestaciones, corolario del principio de justiciabilidad. *Comisión de la Mujer v. Giménez Muñoz,* 109 D.P.R. 715, 720-722 (1980).

La falta de madurez plantea la ausencia de una completa elaboración o desarrollo de una controversia. Esta se considera prematura para decisión por el foro judicial cuando no se ha definido, configurado o estructurado de forma tal que la misma pueda ser efectivamente resuelta por el tribunal. El razonamiento básico de la doctrina de madurez es evitar la adjudicación judicial prematura de desacuerdos abstractos sobre políticas administrativas y proteger a las agencias de interferencia judicial hasta que su decisión haya sido formalizada y los efectos sean sentidos en forma precisa por las partes. Schwartz, *Administrative Law,* segunda edición, Little, Brown and Co., Toronto, 1984, sec. 9.1, pág. 522. Véase, además, *Abbott Laboratories v. Gardner,* 387 U.S. 136 (1967), 18 L ed 2d. 681, 691, 87 SCt 1507 (1967).

Las doctrinas conocidas como de jurisdicción primaria y agotamiento de remedios administrativos también se han desarrollado para establecer el foro que corresponde inicialmente adjudicar la controversia y determinar el momento propicio para la intervención judicial. La decisión de una agencia no está madura sino hasta que se hayan agotado los remedios que concede la agencia. La doctrina de agotamiento de remedios administrativos gobierna el momento en que un tribunal está mejor informado para tomar una decisión sobre el recurso instado. Bajo ese requerimiento, se pospone la etapa en la cual se puede acudir a los tribunales hasta que el litigante agote todos los remedios disponibles en el foro administrativo. *Rivera v. E.L.A.,* 121 D.P.R. 582, 593-595 (1988). De esta forma se permite a la agencia rectificar sus errores durante el proceso administrativo evitando la intervención judicial a destiempo e infundada. Así se logra el balance de poderes que debe existir entre las agencias administrativas y los tribunales y se permite la compilación de un récord administrativo completo que facilite el proceso de revisión judicial. *Mercado Vega v. U.P.R.,* 128 D.P.R. 273, 282 (1991).

La L.P.A.U. recoge en su sección 4.3 la doctrina de agotamiento de remedios al establecer que *"el tribunal podrá relevar a un peticionario de tener que agotar alguno o todos los remedios administrativos provistos en el caso de que dicho remedio sea inadecuado, o cuando el requerir su agotamiento resultare en un daño irreparable al promovente y en el balance de intereses no se justifica agotar dichos remedios...",* 3 L.P.R.A. Sec. 2173.

Habiendo determinado la aplicabilidad de la L.P.A.U. a estos procedimientos es requisito, como hemos visto, que antes de recurrir a los tribunales los confinados agoten los remedios administrativos a su alcance. Aunque la Administración de Corrección no tiene establecido en el reglamento aplicable al Comité de Clasificación un procedimiento donde los confinados puedan acudir para impugnar las determinaciones que tome dicho Comité, nos percatamos de que sí tiene uno denominado *"Reglamento para Atender las Quejas y Agravios Radicadas por los Confinados".* El mismo fue aprobado el 15 de mayo de 1992 y creado con el fin de que los confinados tuvieran un mecanismo para poder interponer sus quejas y agravios. Dicho Reglamento proporciona un vehículo al confinado cuando se trata de una queja o agravio relacionada directa o indirectamente con actos o incidentes que afecten o les

pueda afectar personalmente en su bienestar físico, mental o en su seguridad personal. Ciertamente, el nivel de custodia de un confinado es un factor que le afecta directamente en su bienestar mental y hasta en su seguridad personal.

La definición de agravio en dicho reglamento establece que es toda aquella situación que el confinado informe por escrito, por entender que le afecta la moral y/o la dignidad de su persona. La queja es definida como toda aquella situación que el confinado informe por escrito, por entender que afecta su vida de confinamiento. La denegatoria de una clasificación es, pues, claramente una queja y agravio.

No se nos escapa que dicho reglamento excluye de su aplicación la impugnación de toda decisión emitida por cualesquiera otro Comité en virtud de otro Reglamento incluyendo el de Clasificación y Tratamiento. Sin embargo, hay que destacar que no conocemos de otro reglamento que regule o contemple un procedimiento para que los confinados puedan impugnar la determinación del Comité denegando una solicitud de nivel de clasificación. Específicamente los reglamentos aplicables a la clasificación de los confinados que crean y definen las funciones del Comité antes mencionados, carecen de una etapa de revisión interna administrativa donde se le conceda al que desee impugnar la adjudicación del Comité referente a su custodia, una oportunidad para revisar la determinación tal y como lo contempla el Reglamento de Quejas y Agravios en su Art. XIV, Sección 1. ■ Este ciertamente regula un procedimiento de revisión interna administrativa disponible para los confinados antes de acudir al foro judicial ■ y representa una magnífica oportunidad para que la agencia pueda considerar los aspectos de la controversia incluyendo la posición del confinado al respecto tal y como lo contempla la doctrina de madurez. Aunque el mismo provee para la celebración de una vista informal, Sección 4, permite al Oficial Examinador prescindir de ella *"cuando entiende que está en posición de emitir su resolución con el contenido del expediente levantado por la oficina de Quejas y Agravios."* Artículo XIV, Sección 9.

Tomando en consideración que el revisar la determinación que tome el Comité de Clasificación encaja perfectamente en los fines y propósitos que regula y persigue el procedimiento estatuido mediante el mecanismo de Quejas y Agravios en el citado Art. XIV, no vemos impedimento alguno para que los confinados lo utilicen para impugnar las determinaciones del Comité de Clasificación antes de acudir al foro judicial como medida que encaja y cubre lo que contempla el principio de madurez. Por tal razón, en el uso de nuestra facultad para discrecionalmente abstenernos de considerar los planteamientos de un confinado hasta que Corrección haya tenido la oportunidad de considerar y resolver todos los aspectos de la controversia a la luz de las circunstancias del caso, los remedios disponibles y la pericia particular de la agencia, *Junta Examinadora de Tecnólogos Médicos v. Elías y otros,* 97 **J.T.S.** 141; *Rivera v. E.L.A., supra,* determinamos, en ausencia de reglamento alterno, que sea de aplicación el Art. XIV y subsiguientes del de Quejas y Agravios a los procedimientos apelativos dentro de la agencia una vez el Comité haya emitido una denegatoria de concesión de custodia a un confinado y éste impugne el dictamen.

Ahora bien, no obstante, lo anteriormente expresado, nada impide que la Administración de Corrección adopte algún tipo de reglamento similar al de Quejas y Agravios, o enmiende los disponibles a los fines de proveer los procedimientos a seguirse para impugnar una determinación del Comité de modo que se le permita a los reclusos ejercer el derecho a revisar las determinaciones del Comité de Clasificación en lugar de acudir al de Quejas y Agravios sin que con ello se entienda que estamos exigiendo a la Administración de Corrección más salvaguardas que las establecidas en su propio Reglamento de Quejas y Agravios. Véase, sobre ese particular, Davis Pierce, *Administrative Law Treatise,* tercera edición, Vol. 1, Little Brown and Co., 1994, págs. 392-394, sec. 8.5. Empero, mientras no haya otro mecanismo para la revisión de las determinaciones del Comité, y observando que el Reglamento de Quejas y Agravios es el más adecuado para la tramitación de estos casos, en lo sucesivo éste debe ser de aplicación en todo lo que no sea compatible con proporcionar a los confinados un foro para la revisión del Comité, antes de acudir a este Foro.

Finalmente, pasemos a considerar las alegaciones del recurrente consistentes en que la determinación del Comité es caprichosa y arbitraria y que le debemos aplicar a su caso la doctrina de cosa juzgada en base a que al decidir su caso el Comité acude a criterios que ya habían sido utilizados en evaluaciones anteriores. Primeramente, el Manual de Clasificación, *supra*, provee los criterios para la asignación de la clasificación de los grados de custodia. Expresamente establece que en toda evaluación de un caso en que se considere la asignación de tipo de custodia deberán tenerse presente los delitos cometidos, las circunstancias de éstos, la extensión de la sentencia dictada, tiempo cumplido en confinamiento y aquellos factores que garanticen la seguridad institucional y pública, entre otros. Capítulo 8.

Adicionalmente, el Manual de Reglas, establece unos elementos que habrá de considerar el Comité al momento de asignarle un tipo de custodia a un confinado. A esos efectos, preceptúa que se considerará la conveniencia de asignarle custodia mediana cuando el historial social y delictivo, así como su comportamiento, reflejen mayormente los siguientes indicadores, entre otros: (a) Aquellos casos que pueden representar algún riesgo de fuga más allá del que representa toda persona recluida en institución penal; (b) Cuando el confinado ingrese por haber violado su libertad bajo palabra o su libertad a prueba, al resultar convicto por delitos menos grave o por no cumplir con las otras condiciones impuestas; (c) Confinados que disfrutando de custodia mínima incurran en nuevos delitos; (d) Todo cliente sentenciado que tenga casos pendientes por resolver en un tribunal. Regla 10B 2(a), (b), (c) y (d).

Para determinar si a un recluso se le debe asignar custodia mínima se considerarán los siguientes factores: (a) Que el confinado no tenga casos pendientes por resolver en los tribunales; (b) Que del historial social y de la evaluación ponderada del caso, se desprenda que el confinado no representa una amenaza para la población penal, empleados del sistema o para la comunidad; (c) Que el historial delictivo y circunstancias en que cometió el delito no revelen peligrosidad o habitualidad; (d) Su comportamiento observable debe evidenciar que ha ganado sentido de responsabilidad, que ha habido crecimiento personal, que ha demostrado interés por los programas de tratamiento y sacado provecho de éstos y se ha trazado unas metas reales y claramente definidas para reintegrarse a la comunidad como ciudadano útil; (e) Que su historial social y delictivo no revele un riesgo de fuga más allá del que representa todo confinado; (f) Que el confinado acepte y observe las normas institucionales; (g) Que su situación emocional sea razonablemente estable, de forma tal que no represente riesgo para él, ni para sus compañeros y la sociedad en general, Regla 10(C) del Manual de Reglas.

Observamos que aunque los criterios y factores señalados para determinar el nivel de confinamiento de un recluso son, en muchas ocasiones, elementos de juicio subjetivos, es el Comité, por tratar a diario con estos casos, quien está en mejor posición para determinar si a este recluso en particular se le debe adjudicar una clasificación de custodia mediana o mínima. En este caso determinó que el recluso representaba un riesgo de fuga en base a los récords que indicaban que éste se evadió de la institución penal que se encontraba, en unión al hecho de que en ocasiones anteriores había violado su libertad a prueba y bajo palabra. Surge, además, que en el año 1997 se declaró culpable por dos infracciones a la Ley de Armas.

Ciertamente, el récord ante nos avala la decisión del Comité. El confinado, en ocasión anterior no sólo violó su libertad bajo palabra sino que incurrió en delitos posteriores mientras se encontraba disfrutando de ella. No hay duda de que de la totalidad del expediente surge que el Comité no abusó de su discreción al determinar que se le mantuviera en un nivel de custodia mediana. Nada en su expediente nos coloca en condiciones para negarle deferencia a esa determinación de la agencia administrativa, aunque se trate de una adjudicación tipo informal. Véase, *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 84 L Ed. 2d 643, 105 S.Ct 1598 (1985); *PBGC v. LTV Corp.,* 496 U.S. 633, 110 L. Ed 2d. 579, 600, 110 S.Ct. 2668 (1990). Consiguientemente, resolvemos que la determinación del Comité no fue caprichosa, arbitraria, ni irrazonable.

Adicionalmente, el alcance judicial de una decisión administrativa está limitado por la sec. 4.5 de la L.P.A.U.,

3 L.P.R.A. sec. 2175. Esta disposición requiere que los tribunales confirmen las determinaciones de hechos de una agencia administrativa si están sostenidas por evidencia sustancial que obre en el expediente administrativo, 3 L.P.R.A. Sec. 2181. Véase, *Facultad para las Ciencias Sociales v. C.E.S.,* **93 J.T.S. 88.** Para que un tribunal pueda decidir que la evidencia en el expediente administrativo no es sustancial es necesario que la parte afectada demuestre que existe otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia, hasta el punto de que un tribunal no pueda, concienzudamente, concluir que la misma no es sustancial en vista de la prueba presentada y hasta el punto que se demuestre claramente que la decisión del organismo administrativo no está justificada luego de una evaluación justa del peso de la prueba que tuvo ante su consideración. *Atrium Plaza v. ARPE,* **95 J.T.S. 39.** Como se ve, esa no es la situación en este caso.

De igual forma, las conclusiones e interpretaciones de los organismos administrativos especializados merecen gran consideración y respeto por los tribunales en la etapa de revisión judicial. *Fuentes v. ARPE,* **93 J. T.S. 105.** Es doctrina establecida que las agencias administrativas gozan de una presunción de corrección por razón de su especialización en determinada área y los tribunales sólo deben modificar o revocar la actuación impugnada si se demuestra arbitrariedad, ilegalidad o irrazonabilidad. *Misión Industrial v. Junta de Planificación,* **97 J.T.S. 34.**

Asimismo, tampoco nos persuade el argumento del confinado referente a que al caso de autos se le aplica la doctrina de cosa juzgada a la luz de que el Comité basó su decisión en criterios que ya habían sido considerados en evaluaciones anteriores. Dicha doctrina persigue evitar que en un pleito posterior se litiguen cuestiones que ya fueron o que pudieron haber sido litigadas y adjudicadas en un pleito anterior. *Worldwide Food Distributors v. Alberic Colón,* **93 J.T.S. 114.** Para reconocer fuerza de cosa juzgada a una decisión administrativa es necesario que concurra la más perfecta identidad entre las cosas, las causas, las personas de los litigantes y la calidad con que lo fueron. Art. 1204 del Código Civil, 31 L.P.R.A. sec.3343; *Lausell Marxuach v. Díaz de Yáñez,* 103 D.P.R. 533 (1975).

En un procedimiento administrativo, la aplicación de la doctrina de cosa juzgada puede plantearse en tres distintas situaciones: (a) dentro de una misma agencia, a sus propias decisiones; (b) interagencialmente, es decir, de una agencia a otra; y (c) entre las agencias y los tribunales. *Acevedo v. Western Digital,* **96 J.T.S. 42.** Un tribunal debe aplicar la doctrina de cosa juzgada en el campo administrativo cuando una agencia administrativa actúa en una forma cuasijudicial y resuelve controversias de hechos ante sí que las partes han podido litigar en forma oportuna y adecuada. *Acevedo v. Western Digital, supra.*

En ese mismo sentido, la aplicación de la doctrina de cosa juzgada por un tribunal es flexible y depende de la naturaleza de la cuestión que se plantea en el ámbito judicial. Un tribunal debe aplicar dicha doctrina cuando las razones para ello estén presentes con toda su fuerza, modificarla cuando sean necesarias algunas alteraciones y rechazarla cuando las razones en contra de su aplicación sean de mayor peso que aquéllas a su favor. *Acevedo v. Western Digital, supra.* No se debe aplicar la doctrina de cosa juzgada en forma inflexible, cuando hacerlo derrotaría los fines de la justicia, especialmente si se plantean consideraciones de interés público. *Pagán Hernández v. U.P.R,* 107 D.P.R. 720 (1987).

Las evaluaciones que se realizan a los confinados tienen el propósito de determinar su progreso. No en todas las ocasiones se han superado aspectos que son evaluados por el Comité por lo que es perfectamente normal que se ratifique cierto tipo de custodia por razón de los mismos criterios utilizados en una evaluación anterior, o por algunos de éstos. Siendo el grado de custodia parte de la rehabilitación, y siendo ésta la política pública del Estado Libre Asociado, la doctrina de cosa juzgada no puede ser de aplicación bajo las circunstancias atinentes toda vez que el Comité está facultado a evaluar periódicamente a los reclusos con el fin de determinar su nivel de custodia tomando en consideración para ello precisamente todos los elementos y factores necesarios, aunque

éstos se repitan si colectivamente no se han superado.

Es irrelevante en este caso que algunos de dichos elementos hayan sido considerados por el Comité en ocasión anterior debido a la interelación que existe de unos criterios existentes con otros, particularmente aquellos que no se han superado y que conjuntamente deben ser considerados. Vemos como, por ejemplo, el Manual de Reglas exige que en toda evaluación deberá tenerse presente los delitos cumplidos. Asimismo, no podemos razonar que por el hecho de que unos criterios de clasificación han sido considerados anteriormente, sea razón suficiente para descartarlos en la próxima evaluación. Se trata de unos factores de seguridad y supervisión que pueden repetirse y que, de hecho, a menudo se repiten. Estos, junto a otros factores, deben ser considerados por el Comité al tomar su decisión.

En síntesis, concluimos que la L.P.A.U. es de aplicación a los fines de revisar el Comité que determina el nivel de custodia de los confinados. Determinamos, además, prospectivamente, que las decisiones del Comité podrán ser impugnadas por los confinados mediante el procedimiento de Quejas y Agravios ante la carencia de disposición en los reglamentos vigentes que permita a los confinados impugnar la determinación del Comité en relación con su clasificación y nivel de confinamiento, y, finalmente, que en este caso no habremos de intervenir en la decisión del Comité concediendo un nivel de custodia mediana al confinado por entender que está sostenida por la totalidad del récord ante nos y la misma no es caprichosa, arbitraria ni irrazonable.

Por todo lo anteriormente consignado, expedimos el auto de revisión administrativa solicitado a los fines de avalar la resolución emitida por el Comité que mantuvo al recurrente en custodia mediana, determinar que la L.P. A.U. aplica a las decisiones del Comité Sobre Clasificación de Custodia de los Confinados y disponer que prospectivamente, y hasta que Corrección no provea un mecanismo interno para la revisión de esos dictámenes conforme su actual reglamentación, puedan los confinados acudir al procedimiento establecido en el Reglamento Para Atender las Quejas y Agravios Radicadas por los Confinados a los fines de agotar los remedios administrativos disponibles antes de acudir en revisión al foro judicial.

Lo acuerda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 99 DTA 164

**1.** Artículo XIV, Sección 1 - Si el confinado querellante no estuviese conforme con la respuesta emitida podrá apelar ante el Oficial Examinador, dentro del término de quince (15) días laborables, a partir de la notificación de dicha respuesta para lo cual deberá llenar el formulario establecido a esos efectos, el cual le será provisto por el empleado recopilador durante días y horas laborables.

**2.** *"Artículo XVIII*

*El confinado podrá solicitar revisión judicial de la [r]esolución emitida por el Oficial Examinador dentro de los treinta (30) días siguientes a la notificación [de la reconsideración que someta al Oficial Examinador]."*