# 99 DTA 195

### TRIBUNAL DE CIRCUITO DE APELACIONES
### CIRCUITO REGIONAL DE SAN JUAN

MUNICIPIO DE NARANJITO
Recurrente

v.

OFICINA DEL COMISIONADO DE ASUNTOS MUNICIPALES Y/O JOSE A. OTERO GARCIA, COMISIONADO DE ASUNTOS MUNICIPALES
Recurridos

Núm. KLRA-99-00100

San Juan, Puerto Rico, a 4 de junio de 1999

Panel integrado por su Presidenta, la Juez Alfonso de Cumpiano
y los Jueces Aponte Jiménez y Giménez Muñoz

Giménez Muñoz, Juez Ponente

## TEXTO COMPLETO DE LA RESOLUCION

El recurrente, Municipio de Manatí, solicita la revisión de la decisión de la Oficina del Comisionado de Asuntos Municipales (OCAM) del 31 de agosto de 1998, en la cual se denegó la solicitud de fondos del programa federal Community Development Block Grant (CDBG). De dicha decisión se solicitó reconsideración el 2 de octubre de 1998.

### I

Brevemente, los hechos del caso son los siguientes. El 14 de febrero de 1998, la OCAM realizó una convocatoria en el periódico El Vocero, anunciado la radicación, para el año fiscal 1998-1999, del Plan de Acción Estatal (Plan) ante el Departamento de la Vivienda y Desarrollo Federal (DHUD), en la que solicitaría la cantidad de cincuenta y ocho millones doscientos dieciséis mil dólares ($58,216,000.00) del CDBG. En dicha convocatoria OCAM invitó a las unidades de gobierno local al proceso del desarrollo del Plan y señaló vista para el 2 de marzo de 1998. El 15 de mayo de 1998, el Municipio de Naranjito, clasificado como municipio *"nonentitlement"*, radicó ante OCAM una solicitud llamada *"Propuesta Asignación en Bloque al Estado para Desarrollo Comunal"* solicitando fondos federales.

En junio de 1998, OCAM revisó el Plan de Acción propuesto. El 1 de julio de 1998, la OCAM celebró una reunión para informar a los municipios de los cambios en el plan y para que éstos realizaran cambios a sus propuestas. A dicha reunión no asistió ningún representante del Municipio de Naranjlto. Debido a su incomparecencia, la OCAM envió carta a este Municipio, fechada 2 de julio de 1998, informándole sobre la celebración de la reunión e incluyéndole los documentos que fueron repartidos en la misma. Le informó además que tendría hasta el 15 de julio de 1998 para someter cambios y documentación suplementaria a su propuesta. Al respecto, el Municipio recurrente alega que recibió dicha carta el 10 de julio de 1998 y que en el tiempo restante sometió a OCAM algunos documentos suplementarios.

El 24 de agosto de 1998, OCAM le informó al Municipio que ninguno de los proyectos de su propuesta recibiría fondos para el año 1998. El 31 de agosto de 1998, representantes del Municipio y representantes de OCAM se reunieron para discutir la denegatoria de los fondos. Ese mismo día OCAM envió carta al Municipio en donde se le indicaba que su solicitud había sido revisada de acuerdo a los requisitos, en términos de prioridades, necesidades, la viabilidad de realizar las obras en el término de dieciocho (18) meses y la razonabilidad de sus costos, conforme expresado en el Plan de Acción para el año 1998-1999. Indicó dicha carta que debido al número de propuestas sometidas y a la cantidad limitada de fondos disponibles, no fue posible endosar la solicitud del Municipio.

El 1 de octubre del 98, el Municipio radicó solicitud de reconsideración y ésta fue denegada por resolución de 26 de enero de 1999 de OCAM.

Inconforme con dicha determinación, el municipio presentó recurso de revisión ante nos alegando, en síntesis, que erró OCAM al resolver que el Municipio contó con tiempo suficiente para corregir su propuesta, que todos los proyectos del Municipio obtuvieron más del cincuenta por ciento (50%) necesario para ser considerado para revisar fondos conforme al Plan de Acción Revisado, y que el no proveer información sobre la utilización de los fondos en un tiempo adecuado sólo puede llevar a que OCAM reduzca la cantidad asignada, pero no la total denegación de fondos. Alega, además, que erró al resolver en reconsideración que el Municipio no tiene razón, sin antes realizar una determinación de hechos sobre cuál fue la relación entre las propuestas radicadas por la parte recurrente y las radicadas por el resto de los municipios clasificados *"nonentitlement"*.

## II

El objetivo principal de la Ley Núm. 83-383 del 22 de agosto de 1974, según enmendada, conocida como *"Housing and Community Development Act"* (HUD), 42 U.S.C.A. Sec. 5301, *et. seq.,* es el desarrollo y mejoramiento de comunidades urbanas, dirigidas a beneficiar a personas de ingresos bajos y moderados. 42 U.S.C. A. Sec. 5301(C). Conforme dicha ley, la agencia federal *"Department of Housing and Urban Development"* (DHUD), hace anualmente una distribución de fondos entre los estados y ciudades que sean elegibles a través de distintos programas. 42 U.S.C.A. 5301. Uno de estos programas de distribución de fondos es el *"Community Development Block Grant"* (CDBG).

En Puerto Rico, la Oficina del Comisionado de Asuntos Municipales (OCAM) recibe y administra los fondos federales del programa CDBG y es responsable de evaluar las propuestas y distribuir los fondos CDBG entre los municipios *"nonentitlement"*. Art. 21.0009 de la Ley de Municipios Autónomos, 21 L.P.R.A. Sec. 4001.

Las ciudades son clasificadas como *"entitlement"* o *"nonentitlement"*. Las que cuentan con menos de cincuenta mil (50,000) habitantes son clasificadas como *"nonentitlement"*, en cuyo caso la ciudad no recibe dinero directamente, sino que se le asignan los fondos al Estado. Luego, es éste quien los distribuye entre las ciudades clasificadas *"nonentitlement"*. 42 U.S.C.A. Sec. 5306(a) y (b).

La distribución de los fondos se lleva a cabo de acuerdo al método de distribución establecido en el Plan de Acción Estatal que por disposición de ley adopta el Estado. 5304(a)(1). Los fondos CDBG deben ser solicitados a la OCAM, la cual distribuye los mismos entre los municipios *"nonentitlement"*. Los municipios tienen que competir entre sí para ser merecedores de dichos fondos. A esos efectos, dispone el Plan de Acción Estatal que:

*"The units of local government must apply for projects eligible under a category in a single request. Project funds will be awarded in individual grants on a competitive basis...."*. Parte IX(A)(4) del Plan, p.29.

A cada proyecto se le asigna una puntuación a base de la cual los municipios competirán. Para que una

propuesta sea considerada, ésta debe recibir una puntuación mínima de 90 puntos. Parte IX(A)(5)(3) del Plan. Si la propuesta recibe la puntuación adecuada, tiene derecho a ser considerado y competir para ello con los demás municipios *"nonentitlement"*, que tengan proyectos elegibles. Parte IX(A) (5) del Plan, p.34.

Obsérvese que los municipios no tienen derecho a recibir fondos de una manera automática al recibir más de 90 puntos, sino que anualmente, para ser considerados, los municipios deben radicar propuestas las cuales pueden ser, o no, aprobadas por el Estado. Es a base de las propuestas radicadas que los 59 municipios clasificados *"nonentitlement"* tienen que competir para recibir dichos fondos. La misma naturaleza del término *"nonentitlement"* implica que tales fondos van dirigidos a municipios que no tienen derecho por sí a tales fondos. Es el Estado quien distribuye los fondos competitivamente a base de las prioridades estatales establecidas en el Plan de Acción Estatal. La Ley le otorga discreción al Estado para establecer las prioridades a base de las actividades que haya seleccionado. Así, la Sec. 5306 de la Ley, establece:

*"(C) To receive and distribute amounts allocated under paragraph (1), the State must certify that it, with respect to units of general local government in nonentitlement areas*

*(iii) will not refuse to distribute such amounts to any unit of general local government on the basis of particular eligible activity selected by such unit of general local government to meet its community development needs, except that this clause may not be considered to prevent a State from establishing priorities in distributing such amounts on the basis of the activities selected; 42 U.S.C.A. Sec. 5306(d) (2) (C) (iii)".*

Dicha discreción debe circunscribirse sólo a los programas que resulten elegibles. Es por esto que el Plan de Acción establece que:

*"The amount of the funds to be distributed among the 59 eligible units of local government is $56,951,680. The state will distribute funds on the basis of the particular eligible activity selected by the unit of general local government to meet its community development needs."* Parte IX (3) (b) del Plan.

En su primer error, el Municipio alega que no se le concedió tiempo suficiente para corregir su propuesta. Consideramos que no tiene razón. Una vez se realizan cambios sustanciales en el uso de los fondos recibidos o en la distribución de los mismos, *"el Estado debe proveer a las unidades locales de gobierno notificación razonable y oportunidad de comentar."* 42 U.S.C.A. Sec. 5304(a)(2)(E).

En el caso de autos, OCAM, a requerimiento del HUD, clarificó el método de distribución mediante un Plan de Acción Enmendado, el cual fue puesto a disposición de los municipios para que éstos emitieran los comentarios que entendieran pertinentes. Es debido a la enmienda realizada al Plan de Acción Estatal revisado que se lleva a cabo la reunión del 1 de julio de 1998. No sólo se llevó a cabo la reunión mencionada, sino que se le concedió a todas las partes quince (15) días para que radicaran documentos adicionales.

El Municipio de Naranjito, aunque fue citado a la reunión del 1 de julio de 1998, al igual que los demás 58 municipios clasificados *"nonentitlement"*, no concurrió a la misma ni envió a representante alguno que pudiera asistir a la misma, como lo hicieron otros municipios. Aún así, OCAM le envió por correo los documentos que fueron distribuidos en la reunión, documentación que fue recibida el 7 de julio de 1998, según se desprende del acuse de recibo del correo que se encuentra en el expediente, y no el 10 de julio de 1998 según alega el Municipio, cuando todavía faltaban ocho (8) días para que venciera el plazo límite de entrega de documentos adicionales ante OCAM. El Municipio tuvo tiempo, según lo demuestra el hecho de que durante ese período el Municipio sí sometió los documentos que entendió necesarios, y aun cuando hubiese confrontado algún tipo de problema para someter dichos documentos, el Municipio no realizó gestión alguna ni se comunicó con OCAM, para tratar

cualquier duda o problema que pudiera tener el Municipio para solicitar tiempo adicional para la entrega de documentos.

La comunicación del 2 de julio de 1998, enviada al Municipio junto a los materiales que se distribuyeron en la reunión del 1 de julio de 1998, le indicaba que de tener cualquier duda podía comunicarse con OCAM, algo que el Municipio no hizo. No puede alegar ahora que no tuvo tiempo para entregar documentos adicionales.

De otro lado, el recurrente alega que la OCAM no realizó determinaciones de hechos con relación a la decisión tomada de no concederle fondos para sus propuestas. La Ley Núm. 170 de 12 de agosto de 1988, conocida como la Ley de Procedimiento Administrativo Uniforme (LPAU), 3 L.P.R.A. Sec. 2101 *et seq.*, establece los procedimientos y requisitos que debe cumplir una agencia administrativa cuando lleva a cabo una adjudicación. Entre éstos se encuentra el que las órdenes de las agencias estén acompañadas de determinaciones de hechos y conclusiones de derecho. 3 L.P.R.A. Sec. 2164. No se trata aquí, sin embargo, de una adjudicación formal según se contempla en la LPAU. La concesión de fondos a los municipios no está rodeada de todas las formalidades que implica una adjudicación formal, como lo son derecho a vista, a presentar evidencia y a refutar la prueba presentada, entre otras. No siendo un procedimiento formal, no le son de aplicación las disposiciones del capítulo de procedimientos adjudicativos formales contenidos en la LPAU; disposiciones entre las cuales se encuentran la exposición de determinaciones de hechos y de derecho. Basta con que la parte cuente con información suficiente para conocer los fundamentos de la decisión.

Cabe señalar que estamos ante lo que podemos considerar una subvención. Una subvención es definida por el Diccionario Vox de la Lengua Española como la *"cantidad con que el Estado u otra corporación pública dota una institución, servicio, etc., que no administra directamente"*. Diccionario General Ilustrado de la Lengua Española Vox, 10 edición, Barcelona, Bibliograf SA, 1994. Los fondos en el presente caso fueron provistos por el DHUD para ser distribuidos por el Estado Libre Asociado entre los municipios clasificados *"nonentitlement"*, lo que a todas luces lo clasifica como una subvención. Establece la LPAU que:

*"Cuando por disposición de una ley, regla o reglamento o de este Capítulo una agencia deba adjudicar formalmente una controversia, los procedimientos deberán regirse por las disposiciones de este subcapítulo. ...*

*Se considerarán procedimientos informales y no estarán sujetos a este subcapítulo, excepto según se provee más adelante, la adjudicación de subastas, la concesión de préstamos, becas, subsidios, subvenciones, emisiones de deudas, inversiones de capital y reconocimientos o premios."*

Por tanto, la concesión de fondos CDBG es un procedimiento informal que no requiere de los procedimientos formales que establece la LPAU. Se trata aquí de fondos que son concedidos discrecionalmente, cuyo procedimiento de concesión no se realiza de acuerdo a los procedimientos adjudicativos formales de la LPAU. Sin embargo, este hecho no impide que ejerzamos nuestra función revisora. Por ende, aun cuando no es requisito exponer determinaciones de hechos y conclusiones de derecho, por no encontrarnos ante un procedimiento adjudicativo formal, es imperativo que al denegar tales fondos, OCAM exponga razones suficientes para dicha denegatoria. Esto es así, ya que es necesario que tengamos alguna base para poder realizar nuestra función revisora y poder establecer que la determinación de la agencia administrativa no fue caprichosa o arbitraria.

Así, el Tribunal Supremo Federal, en *PBGC v. LTV Corporation,* 496 U.S. 633, 654 (1990), adujo que un tribunal no puede requerirle a una agencia que utilice procedimientos mayores que aquellos requeridos por estatuto o por el debido proceso de ley. Sin embargo, el Tribunal sostuvo que la sección de la Administrative Procedure Act, que le exige a los tribunales que se aseguren de que la acción de la agencia no ha sido arbitraria, caprichosa ni contraria a la ley, le impone a la agencia el requisito de que provea una explicación de la decisión que tomó. En la

colección de Davis & Pierce, *Administrative Law Treatise* I, Third Edition, Sec. 8.5 (Supp. 1997), los autores apoyan esta decisión. Señalan éstos que:

*"An agency is never required to provide findings and conclusions to support a decision made in an informal adjudication. Nor is it required to support any findings with substantial evidence. An agency is required only to provide a brief statement of the grounds for denial if it denies an application, petition or request."* Supp. 1997, p. 207.

El criterio de revisión que el tribunal debe aplicar es, pues, el de razonabilidad, sosteniendo las conslusiones e interpretaciones administrativas siempre que la agencia no haya actuado arbitraria o ilegalmente, o en abuso de su discreción. *Misión Industrial v. Junta de Planificación,* 146 D.P.R. ___ (1998), **98 J.T.S. 79.** Y para hacer esto es necesario que la agencia exponga algún tipo de razón por la cual tomó su decisión.

En el caso ante nos, OCAM le informó al Municipio la puntuación que obtuvo y las razones para denegarle los fondos. Esto lo hizo tanto personalmente, en reuniones celebradas el 24 de agosto de 1998 y el 31 de agosto de 1998, como de forma escrita, mediante carta fechada 31 de agosto de 1998. Mediante esta última se le hizo saber al Municipio que su solicitud fue revisada de acuerdo a los requisitos en términos de prioridades, necesidades, viabilidad de realizar las obras en el término dispuesto y la razonabilidad de sus costos. Además, se le informó que no le fue posible endosar su solicitud debido al número de propuestas sometidas y la cantidad limitada de fondos disponibles. Como el mismo Municipio admite, además de indicarle la puntuación recibida en cada proyecto, se le hizo saber además las deducciones que se le hicieron y las razones para ello. En su Resolución, la OCAM señala que la no asignación de fondos CDBG se debió a la relación entre los proyectos radicados por el Municipio de Naranjito y los radicados por el resto de los municipios clasificados *"nonentitlement"*. Como podemos observar, pues, la OCAM expuso razones suficientes para denegar los fondos. Ante estas circunstancias no podemos concluir que la determinación de OCAM fue arbitraria y caprichosa.

Hemos visto, pues, que contrario a lo que alega el recurrente, no es correcto que OCAM no tomó en consideración los objetivos de la ley. La distribución de los fondos se realizó de acuerdo a los requisitos establecidos en la ley y al método de distribución expuesto en el Plan de Acción Estatal. El hecho de que el municipio de Naranjito sea uno clasificado como *"nonentitlement"* y, por lo tanto, tenga derecho a ser considerado para recibir fondos no significa que tenga necesariamente que recibir fondos. Siendo esto así no podemos concluir que OCAM se apartó de los objetivos de la ley.

Por las consideraciones anteriores, se deniega la expedición del recurso solicitado.

Así lo acordó el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General